*Gagliardo v. Arlington Cent. Sch. Dist.*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2006

(Argued: November 27, 2006      Decided: May 30, 2007)

Docket No. 06-1494-cv

------------------------------------------------------x

ANTHONY GAGLIARDO and ADELE GAGLIARDO,

Plaintiffs-Appellees,

-- v. --

ARLINGTON CENTRAL SCHOOL DISTRICT,

Defendant-Appellant.

------------------------------------------------------x

B e f o r e :  Jacobs, Chief Judge, Walker and Raggi, Circuit
Judges.

Defendant-appellant Arlington Central School District appeals from a judgment of the United States District Court for the Southern District of New York (Colleen McMahon, Judge) entered March 24, 2006, granting summary judgment in favor of plaintiffs-appellees Anthony and Adele Gagliardo on their claim brought pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq., for reimbursement of tuition expenses incurred in educating their child at a private school of their choosing.

REVERSED and REMANDED.

JEFFREY J. SCHIRO, Kuntz, Spagnuolo, Scapoli & Schiro, P.C., Bedford Village, New York <u>for defendant-appellant</u>.

ROSALEE CHARPENTIER, Attorney, Family Advocates, Inc., Kingston, New York, <u>for plaintiffs-appellees</u>.

JOHN M. WALKER, JR., <u>Circuit Judge</u>:

This is not the usual lawsuit brought under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 <u>et seq.</u>, in which the parents of a disabled child demand reimbursement for the costs associated with sending their child to a private school while the school district defends its decision to provide the child a public school education. In the present action, plaintiffs-appellees Anthony and Adele Gagliardo (the "Gagliardos" or "parents") and defendant-appellant Arlington Central School District (the "School District") agree that the Gagliardos' child, S.G., belonged in a private school for his senior year. They differ only as to the school.

Upon competing motions for summary judgment, the United States District Court for the Southern District of New York (Colleen McMahon, <u>Judge</u>) granted the parents' motion. <u>Gagliardo v. Arlington Cent. Sch. Dist.</u>, 418 F. Supp. 2d 559, 578 (S.D.N.Y. 2006). The district court held principally that the private school chosen by the School District in formulating S.G.'s individualized education program ("IEP") would not afford the

"free appropriate public education" required by the IDEA and that the parents' placement was appropriate; accordingly, it ordered the School District to reimburse the parents for the tuition expenses they incurred in sending S.G. to the private school they chose. In doing so, the district court rejected the conclusions reached by an Impartial Hearing Officer ("IHO") and a State Review Officer ("SRO") to deny reimbursement.

For the reasons that follow, we conclude that the district court's decision to reject the IHO's determination regarding the appropriateness of the private school chosen by the parents is not supported by the record; we thus reverse the judgment of the district court and remand the case with instructions to enter judgment in favor of the School District.

**Statutory Background**

This lawsuit is set against the backdrop of the statutory scheme provided in the IDEA and applicable New York laws and regulations as to which we offer this brief overview.

The IDEA "is the most recent Congressional enactment in 'an ambitious federal effort to promote the education of handicapped children.'" Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998) (quoting Bd. of Educ. v. Rowley, 458 U.S.

176, 179 (1982)).[1]  Under the IDEA, states receiving federal funds are required to provide "all children with disabilities" a "free appropriate public education."  20 U.S.C. § 1412(a)(1)(A); Rowley, 458 U.S. at 180-81.  To meet these requirements, a school district's program must provide "special education and related services tailored to meet the unique needs of a particular child, and be 'reasonably calculated to enable the child to receive educational benefits.'"  Walczak, 142 F.3d at 122 (quoting Rowley, 458 U.S. at 207) (citation omitted).  Such services must be administered according to an IEP, which school districts must implement annually.  20 U.S.C. § 1414(d).

"To meet these obligations and to implement its own policies regarding the education of disabled children, [New York] has assigned responsibility for developing appropriate IEPs to local Committees on Special Education ('CSE'), the members of which are appointed by school boards or the trustees of school districts."  Walczak, 142 F.3d at 123 (citing N.Y. Educ. Law § 4402(1)(b)(1) (McKinney Supp. 1997-98) and Heldman v. Sobol, 962 F.2d 148, 152 (2d Cir. 1992)).  In developing a particular child's IEP, a CSE is required to consider four factors: (1) academic achievement and learning characteristics, (2) social development, (3)

---

[1]    The Supreme court in Rowley interpreted the Education for All Handicapped Children Act of 1975, which was subsequently amended and renamed the IDEA.  For consistency and ease of comprehension, we refer to the statute throughout its history as the IDEA.

physical development, and (4) managerial or behavioral needs. See N.Y. Comp. Codes R. & Regs. [hereinafter "N.Y.C.C.R.R."] tit. 8, § 200.1(ww)(3)(i).

In formulating an appropriate IEP, the CSE must also be mindful of the IDEA's strong preference for "mainstreaming," or educating children with disabilities "[t]o the maximum extent appropriate" alongside their non-disabled peers. 20 U.S.C. § 1412(a)(5); see Walczak, 142 F.3d at 132. New York defines this least restrictive environment as one that (1) provides the special education needed by the student (2) to the maximum extent appropriate with other students who do not have handicapping conditions, and (3) is as proximate as possible to the student's place of residence. N.Y.C.C.R.R. tit. 8, § 200.1(cc).

New York parents who disagree with their child's IEP may challenge it in an "impartial due process hearing," 20 U.S.C. § 1415(f), before an IHO appointed by the local board of education, see N.Y. Educ. Law § 4404(1). The resulting decision may be appealed to an SRO, see N.Y. Educ. Law § 4404(2); see also 20 U.S.C. § 1415(g), and the SRO's decision in turn may be challenged in either state or federal court, see 20 U.S.C. § 1415(i)(2)(A).

**Factual and Procedural Background**

With regard to the academic year at issue, 2002 to 2003, S.G. was a high school senior who was eligible for special

educational services on account of his classification as a student with an emotional disturbance; specifically, he suffered from depression and social anxiety. While this lawsuit involves the parents' request for tuition reimbursement for that period, the relevant history of S.G.'s emotional disturbance begins several years earlier.

S.G. first exhibited symptoms of depression in the fifth grade and began seeing a therapist on a weekly basis in the sixth grade school year from 1996 to 1997. By April 1999, S.G. was receiving more advanced treatment for his depression, including antidepressants. In the fall of 1999, S.G. attended Arlington High School as a ninth grader and started the school year performing quite well. But after being threatened by another student in October of that year, he began to experience anxiety about attending school. Feeling overwhelmed, he found himself skipping classes, and as a result, his grades declined.

S.G. returned to Arlington High School for tenth grade, but as the year passed, his anxiety mounted. In February of 2001, he refused to attend school. Soon thereafter, his parents admitted him to the Adolescent Intensive Outpatient Program at St. Francis Hospital where he underwent a mental status examination and problem appraisal. The social worker at St. Francis, while recognizing that the goal was to get S.G. back in school, opined that he would need a structured educational setting before

transitioning back.  The social worker recommended extended home tutoring; the School District began providing it in early March 2001.

On March 16, 2001, the Gagliardos referred S.G. to the CSE. In April 2001, they consented to an evaluation of their son and completed a social history that indicated he had been teased and bullied by other students, had a history of depression, and did not want to attend school.  The School District's psychologist administered a set of standard intelligence tests, which revealed that S.G. had an IQ in the high average range, average achievement in reading and writing, and superior achievement in mathematics.  Additional testing confirmed S.G.'s anxiety, depression, and exclusion from social interaction.

In June 2001, the CSE convened for an initial examination into S.G.'s situation.  After reviewing all of the evaluations, the CSE classified S.G. as having an emotional disturbance. Consistent with that classification, the CSE developed an IEP for S.G.'s 2001 to 2002 school year, his junior year in high school. It recommended that he receive resource room services one period each day, individualized counseling once a month, and various testing modifications.  The parents consented to the IEP.

S.G. returned to Arlington High School for his junior year, but by September 20, 2001 he refused to attend classes.  On October 16, his treating psychiatrist concluded that S.G. could

not attend school due to his severe anxiety and depression. The School District thereupon arranged for home schooling.

In November 2001, the Gagliardos arranged for a psychiatric evaluation of their son by Dr. Keith Ditkowsky, Director of Clinical Services at New York University's Child Study Center. Also in that month, they withdrew their consent to S.G.'s IEP on the basis that his needs had changed since the IEP had been developed six months earlier. The parents requested a CSE meeting and an extension of home instruction.

Dr. Ditkowsky transmitted his evaluation and recommendation to the Gagliardos in a letter dated December 5, 2001. In the letter, Dr. Ditkowsky recommended that:

> In light of the continued symptoms of his anxiety disorder, coupled with his history of recurrent depression, it appears that [S.G.] would benefit from an alternative placement. Such a setting should have a smaller teacher to student ratio, and be in a more supportive or therapeutic environment. Hopefully this will allow [S.G.] to re-integrate into a school setting. It is also important that the academic curriculum be at an appropriate level given [S.G.]'s clear ability.

Dr. Ditkowsky further emphasized the urgency with which S.G. needed to reintegrate into a school setting and that prolonged home instruction would aggravate his problems.

The CSE met a week later to review the December 5, 2001 letter from Dr. Ditkowsky. Based on the information before it, the CSE described to the parents several alternative high school programs, including that of the Karafin School, a small day

school in Mt. Kisco, New York. The CSE agreed to reconvene at a later date to review further information.

In January 2002, S.G. and his parents began visiting the various alternative high school programs. At the same time, the parents sought independent advice from a private organization regarding other private schools. This organization recommended Oakwood Friends School, a Quaker school in Poughkeepsie, New York, that was not approved for the provision of special education services by the New York State Department of Education.

Dr. Ditkowsky submitted his final report to the CSE on February 7, 2002. In it, Dr. Ditkowsky provided a more detailed description of S.G.'s disorder:

> [S.G. has] a history of recurrent symptoms of depression and anxiety, which have interfered in his ability to function well in school. The persistent pattern of symptoms with occasional exacerbations is consistent with a diagnosis of Dysthymia with intermittent Major Depressive Episodes. . . . [H]is school refusal, coupled with his numerous concerns about running into peers in the school, and social withdrawal is suggestive of social anxiety, most likely consistent with Social Phobia.

Largely echoing his December 5, 2001 recommendations, Dr. Ditkowsky stated that academically S.G. did not appear ready to return to Arlington High School and that he would benefit from placement into a "smaller, therapeutic or more supportive program with a good academic component in order to help him again function in a school setting." Dr. Ditkowsky explained that "[t]his is especially important, as [S.G.] needs not only the

9

credit, but also the social interaction."

On February 11, 2002, the CSE reconvened, with Dr. Ditkowsky participating by telephone. In response to questions regarding how much psychological support S.G. needed during the school day, Dr. Ditkowsky explained that the environment he recommended would include staff with expertise in anxiety disorders that would be able to work with S.G. should issues associated with his emotional disturbance manifest themselves in the course of the school day. At the same CSE meeting, the parents authorized the release of S.G.'s file to Karafin and the other schools that had been discussed at the previous CSE meeting.

The following month, S.G. and his parents visited Karafin and met with the school's associate director, Dr. Bart Donow. According to the Gagliardos, the visit went poorly. Shortly after the visit to Karafin, the parents hired counsel to assist them in their dealings with the School District. Counsel recommended that neuropsychologist Dr. Marian Rissenberg evaluate S.G.

On April 29, 2002, the parents asked for another CSE meeting. In a letter to the School District, they represented that they had visited the various schools discussed in the February 2002 meeting and considered all of them inappropriate for their son. At about the same time, the parents applied for S.G.'s admission to Oakwood and authorized the release of his

information to that school. The parents had not mentioned Oakwood to the School District earlier and did not notify the School District that they were taking this step; they did, however, tell Dr. Rissenberg that they hoped their son would attend Oakwood.

In a letter dated May 16, the parents notified the School District that its "evaluations of [their] son are not correct in diagnosing his disability, [and] therefore not correct in educating or treating him." The parents also requested that Dr. Rissenberg evaluate S.G., and the School District agreed.

The CSE met on June 7, 2002 to conduct S.G.'s annual review. They reviewed the Gagliardos' letter explaining their dissatisfaction with the schools they had visited, including Karafin. The parents were asked for suggestions but provided none. The parents were also asked to consent to additional academic skills testing, but they refused because the same testing was to be administered by Dr. Rissenberg.

On July 8, 2002, Oakwood accepted S.G. Three days later the CSE met to finalize S.G.'s placement for his senior year. At this meeting, the CSE recommended that S.G. be placed at Karafin, with various program modifications, testing accommodations, and once a week counseling. The CSE continued to request additional academic skills testing, and the parents consented. On July 18 and again on July 23, 2002, S.G.'s father wrote to the School

11

District demanding an IEP based on the discussions at the July 11 meeting, which the School District furnished on July 29.

On August 15, 2002, the parents requested an impartial due process hearing, asserting that Karafin was an inappropriate setting for S.G. He commenced attendance at Oakwood in September 2002.

In October 2002, while the due process proceedings were pending, Dr. Rissenberg completed her report on S.G.'s evaluation. Her report, in substance, was consistent with that of Dr. Ditkowsky. She found evidence in S.G. of superior intellectual ability, social anxiety, inflexibility, poor social perception, and depressed mood. She opined that his situation was consistent with a diagnoses of Asperger's syndrome — a mild autistic spectrum disorder — in the context of very superior intellectual capacity. Dr. Rissenberg recommended an alternative academic placement with small classes and an individualized approach, instruction at a high level of conceptual complexity with students whose intellectual capacity was similar to S.G.'s, and discussion-based learning and group participation. She also recommended that S.G. be protected from bullying and ostracizing by peers. Dr. Rissenberg further recommended various supports consistent with an attention deficit disorder, including extended time for tests, preferential seating, help with planning and organization, and individual instruction as needed. Last, she

recommended both individual and group therapy.

After a total of nine days of hearings, the IHO rendered a final decision dated June 19, 2003. It found that (1) the proposed IEP was reasonably calculated to enable S.G. to receive educational benefits and therefore appropriate; (2) the parents did not meet their burden of demonstrating that Oakwood was an appropriate placement; and (3) equitable considerations weighed against granting the parents' reimbursement request. Accordingly, the IHO denied the parents' request for tuition reimbursement. The SRO affirmed the IHO's decision based on the IHO's conclusion that the IEP was appropriate to S.G.'s needs. Because this conclusion was sufficient to affirm the IHO, the SRO did not address findings (2) and (3).

The parents filed this reimbursement action pursuant to 20 U.S.C. § 1415(i)(2). Both parties moved for summary judgment on the amended complaint. The district court granted the Gagliardos' motion. Gagliardo, 418 F. Supp. 2d at 578. The district court found, based on its own review of the administrative record and certain additional evidence, that the proposed IEP that specified Karafin was not appropriate principally because Karafin was not the least restrictive environment in which to educate S.G. See id. at 572-75. It further found that Oakwood was an appropriate placement, id. at 575-76, and that the parents were equitably entitled to

13

reimbursement, id. at 576-78. Accordingly, the district court awarded the parents tuition reimbursement. Id. at 578. Judgment was entered on March 24, 2006, and this appeal followed.

**DISCUSSION**

As we have noted earlier, in order to receive federal funding under the IDEA, a state must provide to all children with disabilities "a free appropriate public education." 20 U.S.C. § 1412(a)(1)(A); Rowley, 458 U.S. at 180-81. If parents believe that the state has failed their child in this regard, they may, at their own financial risk, enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state. See Sch. Comm. of the Town of Burlington v. Dep't of Educ., 471 U.S. 359, 370 (1985); M.S. ex rel. S.S. v. Bd. of Educ., 231 F.3d 96, 102 (2d Cir. 2000). In determining whether parents are entitled to reimbursement, the Supreme Court has established a two part test: (1) was the IEP proposed by the school district inappropriate; (2) was the private placement appropriate to the child's needs. See Burlington, 471 U.S. at 370; Frank G. v. Bd. of Educ., 459 F.3d 356, 364 (2d Cir. 2006). The party who commences an impartial hearing — in this case, the parents — bears the burden of persuasion on both Burlington factors. See Schaffer v. Weast, 546 U.S. 49, 57-58 (2005). If parents meet their burden, the district court enjoys broad discretion in considering equitable factors relevant to

14

fashioning relief. See Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 16 (1993).

In this case, the question of whether the Gagliardos carried their burden of demonstrating that the IEP proposed by the School District was inappropriate is a close one. We need not answer it, however, because this case is easily disposed of under part two of the Burlington test.

Parents who seek reimbursement bear the burden of demonstrating that their private placement was appropriate, even if the IEP was inappropriate. See M.S., 231 F.3d at 104. Subject to certain limited exceptions, "the same considerations and criteria that apply in determining whether the [s]chool [d]istrict's placement is appropriate should be considered in determining the appropriateness of the parents' placement. . . . [T]he issue turns on whether a placement — public or private — is 'reasonably calculated to enable the child to receive educational benefits.'" Frank G., 459 F.3d at 364 (quoting Rowley, 458 U.S. at 207 and identifying certain exceptions). A private placement meeting this standard is one that is "likely to produce progress, not regression." Walczak, 142 F.3d at 130 (internal quotation marks omitted). In Frank G., we explained:

> No one factor is necessarily dispositive in determining whether parents' unilateral placement is reasonably calculated to enable the child to receive educational benefits. Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit, but courts assessing the propriety

15

of a unilateral placement consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs. To qualify for reimbursement under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential. They need only demonstrate that the placement provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction.

459 F.3d at 364-65 (citations and internal quotation marks omitted).

In conducting our de novo review of the district court's holding, we are mindful that the role of the federal courts in reviewing state educational decisions under the IDEA is "circumscribed." Muller v. Comm. on Special Educ., 145 F.3d 95, 101 (2d Cir. 1998); see also Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 191 (2d Cir. 2005) ("In reviewing the administrative proceedings, it is critical to recall that IDEA's statutory scheme requires substantial deference to state administrative bodies on matters of educational policy."). Although the district court must engage in an independent review of the administrative record and make a determination based on a "preponderance of the evidence," Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 (2d Cir. 1997), the Supreme Court has cautioned that such review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review,"

16

Rowley, 458 U.S. at 206. To the contrary, federal courts reviewing administrative decisions must give "due weight" to these proceedings, mindful that the judiciary generally "lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." Id. at 206, 208 (internal quotation marks omitted).

We applied the Rowley deference standard in Walczak, in which we overturned a district court's reversal of an SRO's decision under the IDEA. We noted that, in order for the district court to conduct an "independent" review of the sufficiency of an IEP under the IDEA that does not "impermissibly meddl[e] in state educational methodology," it must examine the record for "objective evidence" that indicates "whether the child is likely to make progress or regress under the proposed plan." Walczak, 142 F.3d at 130 (quoting Mrs. B., 103 F.3d at 1121). And in Frank G., we recently noted that the district court is required to employ the same objective evidence standard when ascertaining the appropriateness of a parent's private placement, see 459 F.3d at 364, always being mindful, of course, that deference to the administrative proceedings is particularly warranted when the district court's decision is based solely on the administrative record, see id. at 367.

In the present case, the district court identified several reasons why it believed that Oakwood was a proper placement for

17

S.G. Gagliardo, 418 F. Supp. 2d at 575-76. The district court pointed out that Oakwood provided S.G. small classes, with twelve to fifteen students; that Oakwood was "supportive" of his emotional needs because, in addition to the Quaker values of tolerance and respect that it promoted, the school did not allow teasing, bullying, or ostracism; that the traditional classroom setting at Oakwood allowed S.G. to benefit from the sort of group activities and discussions that Dr. Ditkowsky and others who evaluated S.G. deemed crucial to both his academic success and his development of social skills; and that S.G. achieved promising grades while at Oakwood. Id.

The district court reached its conclusion despite the fact that the IHO, confronted with the same evidence, found that Oakwood was not an appropriate placement for S.G.[2] The IHO explained that the testimony of the parents' own experts showed that S.G. required a therapeutic setting in order to reasonably

___

[2] The district court afforded the IHO's findings on Oakwood no weight, evidently because the SRO discussed only the School District's proposed placement at Karafin. If a final state determination conflicts with an earlier decision, the earlier decision may be afforded diminished weight. See Karl v. Bd. of Educ., 736 F.2d 873, 877 (2d Cir. 1984) (holding that courts owe deference to the final agency determination where the review officer disagrees with the hearing officer); Heather S. v. State, 125 F.3d 1045, 1053 (7th Cir. 1997) (holding the same and noting that "the 'due weight' which the court must give to the hearings below is . . . to the decision of the hearing officers . . . [which] is an easier task where . . . the hearing officers are in accord"). Here, however, the SRO did not reject the IHO's findings or analysis. To the contrary, the SRO's decision explicitly noted that the IHO's findings were supported by the record.

assure that he would receive educational benefits as required by Rowley. Such a setting, the IHO noted, required a staff trained in dealing with the special needs attributable to S.G. on account of his emotional disorder. See Frank G., 459 F.3d at 364 (In order for the parent's private placement to be appropriate under Rowley, it must provide "educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from instruction."). Because Oakwood lacked such a therapeutic setting, the IHO found that it was an inappropriate placement for S.G.

The district court's grounds for disturbing the IHO's reasoned conclusion are not supported by the record. In rejecting the IHO's conclusion, the district court emphasized that, according to Dr. Ditkowsky, S.G. did not require a school with a "therapeutic" setting; instead, he needed a school with an environment that was either "therapeutic or supportive." Gagliardo, 418 F. Supp. 2d at 576. Importing its own view on the latter notion, the district court found that a supportive environment was achieved at Oakwood through a combination of its Quaker values and S.G.'s private therapy. See id.

The district court's reasoning ignores the substance of Dr. Ditkowsky's recommendations. In the February 11, 2002 CSE meeting, Dr. Ditkowsky clarified what he meant by a "supportive

19

or therapeutic environment" when responding to a CSE member's question regarding how much psychological support S.G. needed during the school day. Dr. Ditkowsky explained that his recommendation did not hinge on any clinical meaning ascribed to the words therapeutic or supportive; the thrust of his recommendation, rather, was that S.G. be placed in a school where trained professionals could work closely with him and assist him as issues associated with his disorder surfaced throughout the day. At the due process hearing, Dr. Ditkowsky reiterated these comments. He testified that S.G. needed to be placed in a school that had staff trained in dealing with anxiety disorders so as to "help him . . . survive through the day if he really was struggling or suffering." The record shows, as the IJ noted, that Oakwood did not have a staff of such professionals, and while his private therapy may have been able to help him after school, it was not available throughout the school day.

The district court also found that the IHO was incorrect in stating that Oakwood did not have any special education services because literature from the school explains that Oakwood provides students in S.G.'s position with certain forms of academic support. Gagliardo, 418 F. Supp. 2d at 576. The district court further observed that teachers certified in special education are not required for a parental placement to qualify as an appropriate placement for tuition reimbursement. Id. (citing

20

Carter, 510 U.S. at 14). The context of the IHO's discussion of this issue demonstrates, however, that he was not suggesting Oakwood did not provide special education services as a general matter, but instead that Oakwood did not provide the special education services specifically needed by S.G. — namely, an educational setting consistent with Dr. Ditkowsky's recommendation. Oakwood's own Upper School Head supported this finding in her testimony at the due process hearing to the effect that Oakwood does not provide the kind of special education services that S.G.'s condition required.

In sum, the IHO's finding that Oakwood was not an appropriate placement for S.G. is reasoned and supported by the record, including the history of S.G.'s struggle with his emotional disturbance and his resulting inability to attend school. We see no reason for the district court to have disturbed it. Because tuition reimbursement is available only for an appropriate private school placement, we reverse the district court's judgment ordering the School District to reimburse the parents for the cost of S.G.'s tuition at Oakwood.

We finally add a word about the position a district court finds itself in where, as here, it is called upon to review a case in which parents have enrolled their disabled child in a private school, believing it to be the best thing for the child, and can point to their child's record of success at the school

21

they chose. It is understandable that a district court would be receptive to parents under these circumstances; a child's progress is relevant to the court's review. But such progress does not itself demonstrate that a private placement was appropriate. See Berger v. Medina City Sch. Dist., 348 F.3d 513, 522 (6th Cir. 2003) ("[E]vidence of academic progress at a private school does not itself establish that the private placement offers adequate and appropriate education under the IDEA."); Rafferty v. Cranston Pub. Sch. Comm., 315 F.3d 21, 26-27 (1st Cir. 2002) (same). Indeed, even where there is evidence of success, courts should not disturb a state's denial of IDEA reimbursement where, as here, the chief benefits of the chosen school are the kind of educational and environmental advantages and amenities that might be preferred by parents of any child, disabled or not. A unilateral private placement is only appropriate if it provides "education instruction specifically designed to meet the unique needs of a handicapped child." Frank G., 459 F.3d at 365 (quoting Rowley, 458 U.S. at 188-89) (emphasis added).

## CONCLUSION

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND with instructions to enter judgment in favor of the School District.