R.B. and H.Z., on behalf of their minor child, C.Z., Plaintiffs,

v.

NEW YORK CITY DEPARTMENT OF EDUCATION and Joel Klein, Defendants.

No. 09 Civ. 7758(RJS).

United States District Court, S.D. New York.

May 5, 2010.

Lauren A. Baum, Law Offices of Lauren A. Baum, P.C., New York, NY, for Plaintiffs R.B. and H.Z.

Samantha Springer and Abigail Lynne Goldenberg, New York City Law Department, New York, NY, for Defendants New York City Department of Education and Joel Klein.

## MEMORANDUM AND ORDER

RICHARD J. SULLIVAN, District Judge:

Plaintiffs R.B. and H.Z., on behalf of their minor child, C.Z., bring this action pursuant to the Individuals with Disabilities Education Act ("IDEA")[1] against Defendants New York City Department of Education ("DOE") and New York City School District Chancellor Joel Klein. Plaintiffs have moved for summary judgment, seeking review of the June 8, 2009 decision of State Review Officer Paul F. Kelly denying Plaintiffs' claim for tuition reimbursement. Defendants have cross-moved for summary judgment. For the reasons stated below, the motion by Defendants is granted in part and denied in part, and the motion by Plaintiffs is granted in part and denied in part.

### I. BACKGROUND

#### A. Statutory Framework

The IDEA requires states receiving federal funds to provide children with disabilities a "free appropriate public education." 20 U.S.C. § 1412(a)(1)(A). Under the IDEA, a free appropriate public education ("FAPE") must provide "special education and related services tailored to meet the unique needs of a particular child" that are " 'reasonably calculated to enable the child to receive educational benefits.' "[2] *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir.1998) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). Both federal and state special education laws require that a child with a disability be educated in the last restrictive environment, that is, with nondisabled peers to the extent feasible and appropriate. 20 U.S.C. § 1412(a)(5); N.Y. Educ. Law § 4402.

The special education and related services required by the IDEA are provided

---

1. In 2004, Congress reauthorized the Individuals with Disabilities Education Act as the Individuals with Disabilities Education Improvement Act. *See* Pub.L. No. 108–446, 118 Stat. 2647 (Dec. 3, 2004), effective July 1, 2005. Throughout this Memorandum and Order, statutory references will be to the IDEA.

2. The IDEA defines "related services" as "transportation, and such developmental, corrective, and other supportive services ... as may be required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(26)(A).

to students pursuant to an individualized education program ("IEP"), which school districts must provide annually. 20 U.S.C. § 1414(d). The IEP is a written program of instruction that "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Honig v. Doe,* 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). The IEP is developed by a "team" consisting of the child's parents, teachers, representatives of the local educational agency, and, where appropriate, the child. 20 U.S.C. § 1414(d)(1)(B). In New York, the IEP team is called the Committee on Special Education ("CSE"). *See* N.Y. Educ. Law § 4402(1)(b)(1).

The IDEA also provides "procedural safeguards" to ensure that students with disabilities receive a FAPE. 20 U.S.C. § 1415(a). Specifically, the IDEA requires that states provide parents with the opportunity to present complaints "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." *Id.* § 1415(b)(6)(A). New York State has implemented a two-tiered system of administrative review. N.Y. Educ. Law § 4404. Under the first tier, parents dissatisfied with a proposed IEP may have it reviewed by an impartial hearing officer ("IHO"). N.Y. Educ. Law § 4404(1). Following the decision of the IHO, an aggrieved party may appeal to a state review officer ("SRO"). *Id.* § 4404(2). After exhausting this two-step administrative process, any party still aggrieved may bring a civil action challenging the decision in federal or state court. 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3).

■ Pursuant to the IDEA'S procedural safeguards, parents dissatisfied with a proposed IEP may unilaterally remove their child from a public school, place the child in a private school they believe to be appropriate to the child's needs, and file a complaint with the state educational agency seeking reimbursement for the private school tuition. *See Cerra v. Pawling Cent. Sch. Dist.,* 427 F.3d 186, 192 (2d Cir.2005). A school district will be required to reimburse parents for unilaterally selected educational services if the parents can establish the three *"Burlington–Carter* factors": (1) the educational program recommended by the IEP was inappropriate to meet the child's needs; (2) the alternative placement or additional services selected by the parents were appropriate; and (3) equitable factors weigh in favor of reimbursement. *See A.D. v. Bd of Educ. of City Sch. Dist. of City of N.Y.,* 690 F.Supp.2d 193, 204–05 (S.D.N.Y.2010) (citing *T.Y. v. N.Y. City Dep't of Educ.,* 584 F.3d 412, 417 (2d Cir. 2009)). Parents seeking reimbursement for a unilateral private placement bear the burden of proving that the private placement was appropriate. *Schaffer v. Weast,* 546 U.S. 49, 57–58, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005); N.Y. Educ. Law § 4404(1)(c). Thus, parents who believe that the state has failed to offer a FAPE act "at their own financial risk" when choosing to enroll their child in a private school. *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.,* 553 F.3d 165, 171 (2d Cir.2009) (internal citation omitted).

## B. Facts

The following facts are taken from the administrative record. C.Z., who was born in 1996, has been receiving special education services since the age of three. (Tr. at 35.) While in kindergarten, C.Z. was diagnosed with a central auditory processing disorder and was subsequently classified as speech impaired. (Tr. at 36; IHO Ex. 1 at 2, 9.) At the start of her second-

grade year, C.Z. began attending the Parkside School ("Parkside"), a state-approved non-public school that offers a language-based program for children aged 5–11. (Tr. at 130, 249.) According to testimony at the hearing, Parkside provided C.Z. with a "nurturing" educational environment, where she attended classes of 8–10 students that were taught by a special education teacher and an aide. (Tr. at 133, 142.) While at Parkside, C.Z. also received the related services of occupational therapy and speech and language therapy. (Tr. at 54.) C.Z. attended Parkside until the end of the 2006–2007 school year, her fifth-grade year, when she aged out of the program. (Tr. at 37.)

During the 2006–2007 school year, C.Z.'s parents became worried that the DOE would fail to provide C.Z. with an appropriate placement for the upcoming school year. (Tr. at 43.) On February 13, 2007, C.Z.'s parents signed a contract enrolling C.Z. at York Preparatory School ("York Prep"), a private, regular education school that is not approved by the DOE. (IHO Ex. C.) By signing the contract, C.Z.'s mother agreed to pay all tuition and fees for the 2007–2008 school year. (*Id.*) Plaintiffs also enrolled C.Z. in York Prep's Jump Start program, a supplemental program that provides extra support to special education students. (*Id.*) Enrollment in Jump Start required Plaintiffs to sign an additional contract, pursuant to which Plaintiffs agreed to pay the program's supplemental tuition of $13,800. (*Id.*) C.Z.'s mother also purchased "tuition insurance," at a cost of approximately $2,000, which entitled her to a tuition refund, minus a $4000 nonrefundable deposit, in the event that Plaintiffs elected to enroll C.Z. at a different school. (IHO Ex. D at 1; Tr. at 43.) C.Z.'s mother testified that she purchased the tuition insurance in case the CSE made an appropriate placement recommendation for C.Z. that she wanted to accept. (Tr. at 42–43; 68–69.)

On April 24, 2007, the CSE convened to formulate C.Z.'s IEP for the 2007–2008 school year. (IHO Ex. 6.) After discussing C.Z.'s evolving needs, the CSE changed C.Z.'s classification from speech impaired to learning disabled. (Tr. at 132.) For the upcoming school year, the CSE recommended that C.Z. be placed in a special education class in a community school with a 12:1 student to teacher ratio. (IHO Ex. 6 at 1.) The CSE also recommended the continuation of the related services that C.Z. had received at Parkside: speech and language therapy (120 minutes per week), occupational therapy (80 minutes per week), and counseling (40 minutes per week). The CSE noted that C.Z. "benefits from being in a small, highly structured environment with minimal distractions" where she can learn in a "nurturing setting." (IHO Ex. 6 at 4–5.) Accordingly, the CSE concluded that neither a collaborative team teaching ("CTT") placement[3] nor a general education program would have been appropriate to meet C.Z.'s needs. (IHO Ex. 6 at 14; Tr. at 250.)

At the hearing, C.Z.'s mother could not state with certainty whether she told the CSE that she had enrolled her child at York Prep:

> You know, I don't remember exactly what happened, but if they had asked me, I certainly would've told them. I would have to think I did tell them. It was April, and I'm sure they asked something about, you know, where is she going ... but I don't know exactly. I can't remember exactly.[4]

---

**3.** A CTT class is an integrated class in which general education students and qualified students with IEPs are co-taught by a general education teacher and a special education teacher, N.Y. Comp.Codes R. & Regs. tit. 8, § 200.6(g).

**4.** Later in the hearing, C.Z.'s mother again testified that she thought she told the CSE

(Tr. at 62.) C.Z.'s mother further testified that she never notified the DOE in writing that she planned to send C.Z. to York Prep because "I didn't know I could do that." (Tr. at 62.)

By letter dated May 11, 2007, the DOE informed Plaintiffs that it was unable to provide a specific school placement for C.Z. at that time. (IHO Ex. 8.) The letter indicated that Plaintiffs would receive a Final Notice of Recommendation informing them of C.Z.'s school placement on or before May 30, 2007. (*Id.*) The letter also stated that, "Until a Final Notice of Recommendation with a specific site offer is sent to you, your child has the right to continue in his/her current placement and/or receive all special education services previously recommended by the CSE." (*Id.*) Plaintiffs, however, never received a Final Notice of Recommendation and elected to send C.Z. to York Prep for the 2007–2008 school year. (Tr. at 42.)

### 1. The 2007–2008 School Year at York Prep

York Prep is a private, coeducational school with approximately 340 students in grades six through twelve. (Tr. at 98.) According to the school's psychologist, Dr. Robert Reese, approximately 30% of York Prep's students have IEPs. (Tr. at 98.)

At York Prep, C.Z. was placed in regular education classes of 8–16 functionally similar students that were taught by one teacher without an aide.[5] Of C.Z.'s eight regular education teachers, only two were certified in special education. (Tr. at 104–05.) Additionally, C.Z. did not receive any

direct related services during the 2007–2008 school year. (Tr. at 42.)

As part of her regular education curriculum at York Prep, C.Z. was enrolled in Fundamentals of Reading, a selective class for students who have special reading needs. (Tr. at 58–59, 103.) This class of about 15–16 students, taught by a teacher certified in special education, was devoted to improving specific reading skills, such as decoding, comprehension, and inferential thinking. (Tr. at 103.) While this class was only available to students with deficits in reading, not every student in the class had an IEP. (Tr. at 121.)

As noted above, C.Z. also participated in York Prep's Jump Start program, a supplemental program through which C.Z. received additional academic support from a special education teacher. (Tr. at 99.) The program consisted of two forty-five minute individual sessions per week, as well as group sessions twice a day. (Tr. at 192.) Joan Cruz, C.Z.'s Jump Start teacher, testified that during the group sessions she met with approximately twelve students at once, (Tr. at 209.) In the group sessions, Cruz would check students' planners, make sure they had their materials organized for the day, and help them understand how to complete their homework. (Tr. at 209–10.) In Cruz's individual sessions with C.Z., she would evaluate C.Z.'s work, make sure that C.Z. was following her teachers' directions, and "[tie] up any loose ends." (Tr. at 210.) During the individual sessions, Cruz also provided C.Z. with academic instruction. For example, Cruz focused on improving C.Z.'s

---

that she was considering sending C.Z. to York Prep: "I do believe so, because I could swear in my own mind that they asked you where she's going. . . . They have to ask you where she's going and where I'm considering, and I would always answer it honestly, so I can't imagine that it wouldn't have come up." (Tr. at 88.)

5. At the hearing, there was conflicting testimony as to the size of C.Z.'s regular education classes. Dr. Reese testified that a typical class had 15–16 students, whereas Joan Cruz, C.Z.'s Jump Start teacher, testified that C.Z. was in classes of 8–11 students. (Tr. at 105, 196.)

reading comprehension by working on "sequencing" and "breaking down sentences." (Tr. at 211.) Cruz also testified that she used the individual sessions to develop strategies for improving C.Z.'s attention and behavior in the classroom, such as developing a signal that a classroom teacher could use to keep C.Z. focused. (Tr. at 201.) Both Cruz and Dr. Reese testified that the Jump Start sessions were mandatory for the students in the program, even when the students were not having any issues. (Tr. at 113.)

York Prep also provided an internet-based service called Edline. (Tr. at 99.) Once a week, every student at York Prep received an Edline Report, which provided information regarding the student's grades and performance in each class for the previous week. (Tr. at 99–100.) Each student's report was accessible to parents through a password-protected website. (Tr. at 99–100.)

The record reveals that, during the 2007–2008 school year, C.Z. received passing grades in all of her classes and that the majority of her teachers found her effort to be "satisfactory." (IHO Ex. K at 1.) She had an average grade of 80 in the first semester and of 82 in the second semester.[6] (Id.)

## 2. The IHO Hearing

On March 18, 2008, Plaintiffs filed a due process complaint seeking reimbursement for the York Prep tuition. (IHO Ex. A.) Plaintiffs sought reimbursement of $48,154.20, their total out-of-pocket expense for the 2007–2008 school year. This amount included York Prep's base tuition ($29,700), the tuition for the Jump Start program ($13,800), and the amount paid for tuition insurance ($2004.20), as well as various fees and scholarship contributions.

(IHO Ex. D at 1.) The impartial hearing was held on October 30, 2008, January 7, 2009, and February 9, 2009. (IHO Decision at 3.) The IHO heard testimony from seven witnesses, including C.Z.'s mother, representatives of York Prep, and representatives of Parkside.

At the hearing, the DOE conceded that, by not offering C.Z. a placement for the 2007–2008 school year, it had failed to provide C.Z. with a FAPE. (Tr. at 11.) The scope of the hearing, therefore, was the adjudication of the second and third prongs of the *Burlington–Carter* test: (i) whether C.Z.'s unilateral private placement at York Prep was reasonable, and (ii) whether the equities weighed in favor of reimbursement.

C.Z.'s mother testified that, even though York Prep did not provide the related services that C.Z. received at Parkside, she believed that C.Z.'s needs had been met by the combination of York Prep's general curriculum and the Jump Start program. (Tr. at 42.) Specifically, C.Z.'s mother stated that C.Z. no longer needed occupational therapy and that her speech and language needs had been met by the Fundamentals of Reading class and by her Jump Start teacher. (Tr. at 42.) When asked why she failed to contact the DOE after not receiving a placement, C.Z.'s mother testified that it was not her responsibility to do so: "That's [the DOE's] responsibility, and if they don't contact me, or they don't give it to me, that's what they're supposed to be doing. That's not my job." (Tr. at 85.) C.Z.'s mother further testified that she believed the DOE was aware of C.Z.'s attendance at York Prep because the DOE provided C.Z. with a prepaid Metrocard so that she could take the bus to York Prep. (Tr. at 51.)

---

**6.** At York Prep, a student needs a score of 70 or higher to pass a class. (IHO Ex. K at 1.) Students whose grade average is between 85– 89 make the honor roll, and students whose average is between 90–100 make the Headmaster's List. (*Id.*)

Plaintiffs also called Dr. Reese and Joan Cruz. Both witnesses testified that York Prep was an appropriate placement for C.Z. and that C.Z. had made progress since enrolling at the school. (Tr. at 109, 202.) Dr. Reese testified that C.Z.'s individualized needs had been addressed through the Fundamentals of Reading class and the Jump Start program. Specifically, Dr. Reese stated that the Fundamentals of Reading class provided C.Z. with the help she needed to address her speech and language issues, and the Jump Start program addressed her organizational and study skills deficits. (Tr. at 102–03.) Cruz testified that she worked with C.Z.'s general education teachers to identify strategies for improvement. (Tr. at 201.) As noted above, Cruz also testified that she worked with C.Z. to set goals, improve C.Z.'s ability to ask questions in class, and curb some of her behavioral problems. (Tr. at 201–02.)

Dr. Adina Greenberg, C.Z.'s private psychologist, testified that C.Z. had made progress on her IEP goals during the 2007–2008 school year. (Tr. at 219.) Dr. Greenberg stated that, in her opinion, the teachers at York Prep were responsive to C.Z.'s academic and emotional needs, and that the placement there "could potentially meet [C.Z.'s] needs." (Tr. at 222.)

Plaintiffs also called Albena Miller, one of Parkside's founding directors and a member of C.Z.'s most recent CSE team. Significantly, Miller testified that, based on her experience working with the student at Parkside, a placement in a community school with a 12:1 student-teacher ratio, such as York Prep, was not appropriate for C.Z. (Tr. at 141–42.) Miller explained that, in order to maintain the skills she learned at Parkside, C.Z. needed to be in small classes, of no more than eight students, that had at least two adults providing support. (Tr. at 141–42.) When asked if C.Z. could be appropriately placed in a regular education class where special education support was available, Miller replied, "I can't make that recommendation." (Tr. at 146.)

Dr. Christine Goodman, a DOE psychologist who was present at C.Z.'s April 2007 IEP meeting, testified for Defendants that a general education program was not an appropriate placement for C.Z. (Tr. at 254.) Dr. Goodman testified that C.Z.'s success at Parkside was due to her "very restrictive" classes that provided a "nurturing academic environment." (Tr. at 249–50.) Dr. Goodman concluded, based on a neuro-psychological assessment conducted prior to the 2007–2008 school year, that C.Z.'s deficits in self-regulation, emotional maturity, and attention necessitated a small placement with "a lot of supports." (Tr. at 256.)

Finally, Defendants called Robert Carney, the director of general education transportation for the DOE's Office of Pupil Transportation. Carney testified that when the DOE provides Metrocards to private schools, it is done through a computer program that is initiated by an administrator at the school. (Tr. at 164.) The DOE never gets a list of student names receiving the Metrocards; rather, they receive aggregate data that enables them to distribute 700,000 Metrocards twice a year. (Tr. at 164.)

### 3. The IHO's Decision

On March 5, 2009, the IHO issued her decision, concluding that Plaintiffs were entitled to full reimbursement of the cost of C.Z.'s placement at York Prep, in the amount of $48,154.20. (IHO Decision at 11.)

The IHO found that the combined York Prep/Jump Start program met C.Z.'s special education needs and, therefore, was an appropriate private placement. (IHO Decision at 7.) Specifically, the IHO concluded that the Jump Start program was an

adequate supplement to the general education curriculum and that the two "integrally related" programs constituted a comprehensive educational program for C.Z. (IHO Decision at 10.) Together, the two programs were sufficient to meet C.Z.'s speech and language needs without direct related services. (IHO Decision at 7.)

The IHO also found that equitable factors supported Plaintiffs' claim for reimbursement: "But for the Parent having signed the February 2007 contract with York Prep, [C.Z.] might not have had any placement for the 2007–2008 school year." (IHO Decision at 10.) The IHO further found that Plaintiffs were not required to notify the DOE of their private placement because (i) there was no allegation that Plaintiffs were informed of the notice requirement, and (ii) the DOE never recommended a placement for Plaintiffs to reject. (IHO Decision at 10.)

### 4. The SRO Proceedings

Defendants appealed the decision of the IHO to the SRO. On June 8, 2009, the SRO issued a decision reversing the IHO in part and concluding that Plaintiffs were not entitled to reimbursement for the cost of York Prep's tuition. (SRO Decision at 20.) Specifically, the SRO found that (i) the general education portion of York Prep's program was not appropriate to meet C.Z.'s special education needs and that (ii) equitable considerations weighed against reimbursement. (SRO Decision at 20.)

Rejecting the IHO's characterization of York Prep's general curriculum and Jump Start as "integrally related," the SRO found that Plaintiffs failed to demonstrate that the general education portion of C.Z.'s program was an appropriate placement for the student. (SRO Decision at 13.) To the contrary, the SRO concluded that there was insufficient evidence in the record to demonstrate that C.Z.'s general education courses were specially designed to meet the student's unique needs. (SRO Decision at 13.) The SRO stressed that there was no testimony indicating that C.Z.'s general education teachers provided her with any accommodations, and that the majority of the student's goals from her most recent IEP were addressed solely by her Jump Start teacher. (SRO Decision at 12.) The SRO further noted that feedback from C.Z.'s general education teachers, while largely positive, failed to "specifically indicate if or how the student's unique needs were addressed." (SRO Decision at 12.)

The SRO found that the Jump Start program, on the other hand, did appropriately address C.Z.'s special education needs. (SRO Decision at 16–17.) The SRO cited to the fact that C.Z.'s Jump Start teacher had forty years of experience in special education and was able to appropriately tailor the Jump Start sessions to meet C.Z.'s individual needs. (SRO at 13.) Evidence at the hearing demonstrated that, because of this instruction, C.Z. made progress in study skills, organization, self-esteem, and maturity. (SRO Decision at 15–16.)

The SRO also found "no reason to disturb the impartial hearing officer's finding that the student's speech-language needs as described in the goals contained in the April 2007 IEP were addressed in the fundamentals of reading class and by the Jump Start teacher." (SRO Decision at 17.)

Turning to the third prong of the *Burlington–Carter* analysis, the SRO found that equitable considerations weighed against reimbursement. (SRO Decision at 19.) Specifically, the SRO found that Plaintiffs failed to provide the DOE with the required notice that they were placing C.Z. at York Prep. (SRO Decision at 19.) The SRO further found that Plaintiffs

should have been aware of this notice requirement because they were provided with two copies of the procedural safeguards and rights during the 2007–2008 school year. (SRO Decision at 19.)

### 5. Proceedings in this Court

On September 8, 2009, Plaintiffs filed their complaint in this Court. On January 26, 2010, Plaintiffs moved for summary judgment (Doc. No. 9), and on February 22, 2010, Defendants cross-moved for summary judgment (Doc. No. 12.) The motions were fully submitted on March 29, 2010.

## II. STANDARD OF REVIEW

■ IDEA actions in federal court are frequently resolved on summary judgment motions. *J.R. v. Bd. of Educ. of City of Rye Sch. Dist.*, 345 F.Supp.2d 386, 394 (S.D.N.Y.2004). Unlike a typical motion for summary judgment, however, in an IDEA action the existence of a disputed issue of fact will not defeat the motion. *P.K. ex rel. P.K. v. Bedford Cent. Sch. Dist.*, 569 F.Supp.2d 371, 382 (S.D.N.Y. 2008). Rather, the district court "must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir.2007) (internal quotation marks omitted).

■ "The standard by which a district court reviews the final determination of the SRO has been characterized as modified *de novo*' review." *Student X v. N.Y. City Dep't of Educ.*, No. 07 Civ. 2316(NGG)(RER), 2008 WL 4890440 at *3 (E.D.N.Y. Oct. 30, 2008) (internal quotation marks omitted). "While federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational poli-

cy.'" *Walczak*, 142 F.3d at 129 (quoting *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034). "Thus, district courts may not 'substitute their own notions of sound educational policy for those of the school authorities which they review.'" *A.C.*, 553 F.3d at 171 (quoting *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034).

■ In cases where the SRO's decision conflicts with the earlier decision of the IHO, "the IHO's decision 'may be afforded diminished weight'" *A.C.*, 553 F.3d at 171 (quoting *Gagliardo*, 489 F.3d at 113 n. 2). A district court must " 'defer to the final decision of the state authorities,' even where 'the reviewing authority disagrees with the hearing officer.'" *Id.* (quoting *Karl ex rel. Karl v. Bd. of Educ. of Geneseo Cent. Sch. Dist.*, 736 F.2d 873, 877 (1984)). Deference is "particularly appropriate" where "the state hearing officers' review has been thorough and careful." *Walczak*, 142 F.3d at 129.

## III. DISCUSSION

At the impartial hearing, Defendant conceded the first prong of the *Burlington–Carter* test, admitting that it failed to offer C.Z. a FAPE for the 2007–2008 school year. Thus, in order to demonstrate entitlement to reimbursement for the unilateral private placement, Plaintiff bears the burden of proving prongs two and three: the unilateral private placement was appropriate, and equitable factors weigh in favor of reimbursement.

### A. Appropriateness of the Private Placement

■ A parent's unilateral private placement is appropriate if it is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207, 102 S.Ct. 3034. To satisfy *Burlington–Carter*, the private placement need not "meet the IDEA definition of a free appropriate public education" or "provide certi-

fied special education teachers or an IEP for the disabled student." *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 364 (2d Cir.2006). Rather, "[a] private placement meeting this standard is one that is likely to produce progress, not regression." *Gagliardo*, 489 F.3d at 112 (internal quotation marks omitted).

■ "No one factor is necessarily dispositive in determining whether parents' unilateral placement is reasonably calculated to enable the child to receive educational benefits." *Frank G.*, 459 F.3d at 364 (internal quotation marks omitted). While "[g]rades, test scores, and regular advancement may constitute evidence" that a private placement is appropriate, courts must "consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs." *Id.* Indeed, the Second Circuit has recently instructed that a child's "progress does not itself demonstrate that a private placement was appropriate." *Gagliardo*, 489 F.3d at 115. Rather,

> even where there is evidence of success, courts should not disturb a state's denial of IDEA reimbursement where ... the chief benefits of the chosen school are the kind of educational and environmental advantages and amenities that might be preferred by parents of any child, disabled or not. A unilateral private placement is only appropriate if it provides education instruction *specifically* designed to meet the *unique* needs of a handicapped child.

*Gagliardo*, 489 F.3d at 115 (internal quotation marks omitted).

In this case, the IHO and the SRO agreed that York Prep's Jump Start program was an appropriate unilateral placement for the student.[7] This finding is supported by the record.

Testimony at the hearing established that C.Z.'s Jump Start teacher was certified in special education and had forty years of experience. (Tr. at 191–92.) During her individual sessions with C.Z., the Jump Start teacher developed individualized instruction to address C.Z.'s unique deficits in reading, study skills, and emotional maturity. For example, the Jump Start teacher taught C.Z. specific techniques for improving her reading comprehension and engaged in role-play activities to make C.Z. more comfortable participating in her classes. (Tr. at 202.) Further, the Jump Start teacher reviewed the feedback from her general education teachers and worked with C.Z. to address her specific deficiencies. (Tr. at 200.)

■ Turning to the regular education component of York Prep, there is insufficient evidence in the record to overturn the SRO's finding that York Prep's regular education curriculum was not specifically designed to meet C.Z.'s unique needs. While the record reveals conflicting testimony as to the appropriateness of York Prep's regular education component, where, as here, the SRO's review has been "thorough and careful," deference to his conclusions is "particularly appropriate." *Walczak*, 142 F.3d at 129.

The record indicates that, at C.Z.'s most recent IEP meeting, the CSE deter-

---

**7.** Plaintiff takes issue with the SRO's treatment of York Prep's general curriculum and the Jump Start program as distinct, stand-alone programs, arguing that the two programs are "integrally related and constituted a comprehensive educational program for C.Z." (Pl.'s Mem. at 10.) However, the record reflects that enrollment in the Jump Start program required Plaintiffs to sign a separate

contract and make an additional tuition payment. (IHO Ex. C at 5). Accordingly, this Court will defer to the SRO's characterization of the two programs as independent of one another. *See Stevens ex rel. E.L. v. N.Y. City Dep't of Educ.*, No. 09 Civ. 5327(DLC), 2010 WL 1005165 (S.D.N.Y. Mar. 18, 2010) (analyzing York Prep's regular education curriculum and Jump Start program separately).

mined that C.Z. needed to be in a "small, highly structured" special education environment where she could receive the support that she required. (IHO Ex. 6 at 4–5.) The CSE considered and rejected less restrictive placements, concluding that neither a CTT placement nor a general education program would have been appropriate to meet C.Z.'s needs. Indeed, at the impartial hearing, Plaintiffs' own witness conceded that C.Z. would not be able to transition into a general education class without appropriate support. (Tr. at 141–42.) Nevertheless, at York Prep, the vast majority of C.Z.'s classes consisted of 8–16 students with a single teacher that was not certified in special education. (Tr. at 104–05.)

The record is particularly "sparse" with respect to how C.Z.'s regular education teachers at York Prep "specifically addressed the Student's special education needs." (SRO Decision at 11.) For example, while the testimony at the hearing described in detail the pedagogical methods developed by the Jump Start teacher to address C.Z.'s deficits, there is no indication in the record that any of C.Z.'s regular education teachers made any modifications or tailored their instruction to C.Z.'s unique needs. This is true as well for C.Z.'s Fundamentals of Reading class, which, while providing remedial reading and language instruction from a special education teacher, was not the type of specifically tailored instruction that C.Z. received from her related service provider at Parkside. (Tr. at 111, 115.)

Further, while Edline provided a useful method for teachers to communicate with parents regarding their child's progress, the program was available to all of the students enrolled at York Prep. (Tr. at 99–100.) As such, it is "the kind of educational and environmental advantage[ ] and amenit[y] that might be preferred by parents of any child, disabled or not." *Gagliardo,* 489 F.3d at 115.

Plaintiffs argue that the SRO's finding that York Prep was not an appropriate placement for C.Z. is belied by the testimony of several representatives of York Prep, who testified that C.Z. made progress during the 2007–2008 school year. Indeed, the evidence in the record with respect to C.Z.'s grades indicates that the student did, in fact, demonstrate signs of progress throughout the year. However, to the extent that this testimony identified the reason for C.Z.'s success, it was largely attributable to the individualized methods employed by C.Z.'s Jump Start teacher.

In any event, the evidence of C.Z.'s progress is not so substantial that it warrants reversal of the SRO's finding that York Prep's regular education component was not specifically designed to meet C.Z.'s unique needs. *See Gagliardo,* 489 F.3d at 115 ("[E]ven where there is evidence of success, courts should not disturb a state's denial of IDEA reimbursement" unless the private placement "provides education instruction *specifically* designed to meet the *unique* needs of a handicapped child.") (internal quotation marks omitted). Accordingly, the Court finds that the regular education program at York Prep was not an appropriate unilateral placement.

### B. Equitable Factors

■ Where a school district fails to provide a student with a FAPE and the private placement is found to be appropriate, "the district court enjoys broad discretion in considering equitable factors relevant to fashioning relief." *Gagliardo,* 489 F.3d at 112. "Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required." *Florence County Sch. Dist. Four v. Carter,*

510 U.S. 7, 16, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993).

One equitable consideration is whether the parents complied with the IDEA'S notice requirement. Pursuant to this requirement, prior to unilaterally placing their child in a private school, parents must provide the public school district with notice and an opportunity to provide the student with a FAPE. According to the statute,

(iii) The cost of reimbursement ... may be reduced or denied—

(I) if—

(aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or

(bb) 10 business days ... prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in item (aa);

... [or]

(III) upon a judicial finding of unreasonableness with respect to actions taken by the parents.

20 U.S.C. § 1412(a)(10)(C).

The IDEA, however, contains an exception to the notice requirement, which excuses a parent's failure to notify the district of a private placement if "the parents had not received notice ... of the notice requirement in clause (iii)(I)." 20 U.S.C. § 1412(a)(10)(C)(iv).

Despite the language of the statute, which refers to "the removal of the child from the public school," the notice requirement also applies to parents whose child is enrolled in a private placement at public expense who seek to enroll the student unilaterally in a different private placement. *See S.W. v. N.Y. City Dep't of Educ.*, 646 F.Supp.2d 346, 362–63 (S.D.N.Y.2009).

Here, the SRO found that Plaintiffs failed to comply with the IDEA'S notice requirements and, therefore, equitable factors weighed against reimbursement. (SRO Decision at 19.) The SRO also concluded that Plaintiffs did not qualify for the exception to the notice requirement because the record indicated that they had been provided with copies of the "Parents' Rights Handbook," a document detailing parents' procedural rights and safeguards, including the notice requirement. (SRO Decision at 19; IHO Exs. 2, 8.) After a careful review of the record, the Court disagrees with the SRO's conclusion and finds that the equities weigh in favor of reimbursement for the costs of the Jump Start program.

In this case, Plaintiffs' obligations under the IDEA'S notice requirement were not triggered because the DOE never provided Plaintiffs with a Final Notice of Recommendation. Indeed, Plaintiffs could not have informed the DOE that they were "rejecting the placement proposed by the public agency" because the DOE never made a placement recommendation for Plaintiffs to reject. Further, the DOE, in its letter informing Plaintiffs that a decision on C.Z.'s specific school placement was being deferred, instructed Plaintiffs that, pending receipt of a Final Notice of Recommendation containing a specific site offer, "your child has the right to continue in his/her current placement and/or receive all special education services previously recommended by the CSE." (IHO Ex. 8 at 1.) Here, however, Plaintiffs were unable to keep C.Z. at Parkside because she had aged out of the program. By enrolling her at York Prep,

therefore, Plaintiffs were not removing C.Z. from a public placement or rejecting her IEP, but rather were seeking to continue the level of service to which she was entitled pending a final placement recommendation from the DOE.

Moreover, the record indicates that the purpose of the notice requirement was fulfilled through Plaintiffs' participation in the IEP meetings. As the SRO noted, the IDEA'S notice requirement "giv[es] the school system an opportunity, before the child is removed, to assemble a team, evaluate the child, devise an appropriate plan, and determine whether a [FAPE] can be provided in the public schools." (SRO Decision at 18.) The record reveals that all of these aims were accomplished at the April 2007 IEP meeting, where C.Z.'s mother, along with educators and administrators from Parkside and the DOE, reviewed data from C.Z.'s most recent evaluations and progress reports and made specific recommendations with respect to her special education needs for the upcoming school year. (IHO Ex. 6.) Plaintiffs have contested neither the appropriateness of these recommendations nor the procedural adequacy of the IEP meeting. Rather, their claim for reimbursement is based solely on the DOE's failure to provide C.Z. with a school placement where she could receive the recommended services.

While, arguably, Plaintiffs could have been more vigilant in following up on the DOE's failure to provide a specific school placement for C.Z., Plaintiffs' behavior in this case does not approach the level of uncooperativeness courts have found to warrant a denial of reimbursement on equitable grounds. *See S.W. ex rel. M.W. v. N.Y. City Dep't of Educ.,* 646 F.Supp.2d 346, 364 (S.D.N.Y.2009) (finding the equities weighed against reimbursement where parent signed an enrollment contract with a private school agreeing to reject the public school placement two months before even visiting the proposed public school); *Bettinger v. N.Y. City Bd. of Educ.,* No. 06 Civ. 6889(PAC), 2007 WL 4208560 at *8 (S.D.N.Y. Nov. 20, 2007) (denying reimbursement on equitable grounds where parents refused to visit the two schools proposed by the district); *Carmel Cent. Sch. Dist. v. V.P. ex rel. G.P.,* 373 F.Supp.2d 402, 416 (S.D.N.Y.2005) (finding parents were not equitably entitled to tuition reimbursement where they "never had the slightest intention of allowing the child to be educated in the public school, and did everything possible so that they could frustrate a timely review of [the child's] condition" before enrolling the child in private school).

Unlike the cases cited above, here there is nothing in the record to suggest that Plaintiffs would not have considered, in good faith, a public school placement had one been made. Indeed, the record reflects that C.Z.'s mother fully cooperated in the development of her child's IEP by making C.Z. available for evaluations and participating as a member of the CSE team Even though Plaintiffs enrolled C.Z. at York Prep prior to the April 2007 IEP meeting, their willingness to cooperate with the DOE is evidenced by their purchase of tuition insurance, at a cost of over $2,000—an expense they are unlikely to have made had they been determined to reject a public placement.

The Court is mindful that cases such as this may present the opportunity for parents to take advantage of a school district's failure to make a placement recommendation by remaining silent and then seeking reimbursement for a more desirable private education. While C.Z.'s mother offers no explanation for her failure to contact the DOE after months went by without receiving a placement, such a failure, in and of itself, is not evidence of bad

faith warranting the denial of reimbursement on equitable grounds. Even though Plaintiffs were undoubtedly content to have their child educated at York Prep, reimbursement for the Jump Start program is nevertheless appropriate as Plaintiffs did nothing to "obstruct[ ] the [DOE's] placement process or its ability to provide Plaintiff[s] with a FAPE." *N.R. ex rel. T.R. v. Dep't of Educ. of the City Sch. Dist. of N.Y.*, No. 07 Civ. 9648(BSJ), 2009 WL 874061 at *7 (S.D.N.Y. Mar. 31, 2009); *see also Gabel ex rel. L.G. v. Bd. of Educ. of the Hyde Park Cent. Sch. Dist.*, 368 F.Supp.2d 313, 329 (S.D.N.Y.2005) (finding that even though "the parents may have taken advantage of some of the District's lapses" and were "perfectly happy to be 'forced' to" enroll their child in a private placement, the equities favored the parents because "the District's utter abdication of its responsibility to provide [the student] with a FAPE is so clear from the record—and the law's imposition of this duty on the District is so well-settled").

Therefore, because the record does not suggest that Plaintiffs "acted with the requisite level of unreasonableness or misconduct such that reimbursement should be denied on equitable grounds," *Jennifer D. ex rel. Travis D. v. N.Y. City Dep't of Educ.*, 550 F.Supp.2d 420, 437 (S.D.N.Y. 2008), the equities in this case do not weigh against reimbursement.

### IV. CONCLUSION

For the reasons stated above, the Court finds that (1) the regular education program at York Prep was inappropriate to meet C.Z.'s special education needs, (2) York Prep's Jump Start program was an appropriate unilateral private placement, and (3) the equities weigh in favor of reimbursement for the costs of the Jump Start program. Accordingly, Defendants are hereby ordered to reimburse Plaintiffs for the cost of York Prep's Jump Start program, in the amount of $13,800.

The Clerk of the Court is respectfully directed to enter judgment in favor of Plaintiffs in the amount of $13,800 and to terminate the motions located at docket numbers 9 and 12.

SO ORDERED.