A.L. and V.R., individually and on
behalf of E.L., Plaintiffs,

v.

NEW YORK CITY DEPARTMENT
OF EDUCATION, Defendant.

No. 10–cv–6841 (BSJ).

United States District Court,
S.D. New York.

Aug. 19, 2011.

Gary S. Mayerson, Mayerson and Associates, New York, NY, for Plaintiffs.

Emily Sweet, NYC Law Dept., off. of the Corporation Counsel, Brooklyn, NY, for Defendant.

### *Amended Memorandum and Order* *

BARBARA S. JONES, District Judge.

Plaintiffs A.L. and V.R. bring this action on behalf of their minor son, E.L., under the federal Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 et seq. (the "IDEA"), against Defendant, the New York City Department of Education (the "District" or the "DOE"). Plaintiffs seek review of the August 19, 2010 administrative decision of the New York Office of State Review ("SRO"). The SRO found that the District offered E.L. a free and appropriate public education for the 2009–2010 school year. This decision affirmed the prior determination of the Independent Hearing Officer ("IHO"), who also determined that the District has provided E.L. a free and appropriate public education for the school year at issue. (Def. 56.1 Stmt. ¶¶ 5, 6; Pl. 56.1 Stmt. ¶¶ 5, 6.) Plaintiffs now appeal the SRO decision to this Court.

Before the Court are the parties' cross-motions for summary judgment. For the reasons set forth below, Defendant's motion for summary judgment is granted and Plaintiffs' motion for summary judgment is denied.

### STATUTORY BACKGROUND

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs ... [and] to en-

---

* The Court amends the Memorandum and Order entered August 2, 2011 to include footnote 3 on page 20. This footnote addresses the burden of proof in administrative proceedings pursuant to the IDEA under New York law.

sure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(A) & (B); *see also Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 129 S.Ct. 2484, 2491–92, 174 L.Ed.2d 168 (2009) (discussing the purposes of the IDEA). States receiving federal funding under the IDEA are required to make a free appropriate public education ("FAPE") available to all children with disabilities residing in the state. 20 U.S.C. § 1412(a)(1)(A). To this end, IDEA requires that public schools create for each student covered by the Act an individualized education program ("IEP") for the student's education at least annually. 20 U.S.C. § 1414(d)(2)(A).

 If a school district fails to provide a FAPE to a child with disabilities, the child's parents may remove the child from the improper placement, enroll the child in an appropriate private school, and retroactively seek reimbursement for the cost of private school from the state. *School Committee of Burlington v. Department of Education*, 471 U.S. 359, 369–70, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). However, this decision is made at the parents' own financial risk. *S.H. and B.P., individually and on behalf of S.H. v. New York City Department of Education*, 2011 WL 666098, at *1 (S.D.N.Y. Feb. 15, 2011). The IDEA specifically contemplates that "when a public school fails to provide a FAPE and a child's parents place the child in an appropriate private school without the school district's consent, a court may require the district to reimburse the parents for the cost of the private education." *Forest Grove*, 129 S.Ct. at 2488.

In New York, parents seeking reimbursement for private school tuition may request a hearing before an IHO. The decisions of an IHO may be appealed to the SRO. N.Y. Educ. L. § 4404. Under the IDEA, the final administrative decision of the state, in New York the SRO decision, may be reviewed by a federal district court. 20 U.S.C. § 1415(i)(2)(A). The district court may review the administrative record, hear additional evidence, and grant such relief it deems appropriate. 20 U.S.C. § 1415(i)(2)(C).

## FACTUAL BACKGROUND

The following facts are taken from the administrative record (as set forth in the parties' Rule 56.1 Statements) and are undisputed unless otherwise noted.[1]

### 1. Committee on Special Education Meeting

Plaintiff E.L. (also referred to as "the Student") turned 13 in July of 2009. E.L. was diagnosed with autism at age five; this classification is not in dispute. (Def. 56.1 Stmt. ¶ 1.) Since age seven, E.L. has been placed at the McCarton School ("McCarton"). McCarton is a private special education school located in Manhattan that serves only autistic children. (Def. 56.1 Stmt. ¶ 1.)

On May 1, 2009, a Committee on Special Education ("CSE") convened to develop an IEP for E.L. for the 2009–10 school year. (Def. 56.1 Stmt. ¶ 3.) The CSE consisted of V.R., E.L.'s mother; Kathy Kaufman, a DOE school psychologist; Carol Schaechter, a DOE Special Education Teacher; Tracey Fisher, E.L.'s occupational therapist at McCarton; Erica Konopka, E.L.'s Applied Behavioral Analysis ("ABA") supervisor at McCarton; Adrienne Torres, E.L.'s speech and language pathologist at McCarton; and a parent member representative. (Def. 56.1 Stmt. ¶ 4.) At the meeting, the CSE considered various re-

1. The Court further notes that Plaintiff's Rule 56.1 Statement contains a great deal of legal argument. The Court has considered the legal arguments made in Plaintiff's legal memoranda, rather than in the 56.1 Statement.

ports from McCarton, including a January 2009 educational progress report, a January 2009 speech-language progress report, a January 2009 occupational therapy progress report, E.L.'s IEP from McCarton, and the speech-language goals devised for E.L. by McCarton for 2008–09. The committee also considered two classroom observations of E.L. completed in March and April 2009 by two DOE special education teachers, including Carol Schaecter, a CSE meeting participant. Finally, the CSE considered a psychological assessment of E.L. completed in December 2005. (Def. 56.1 Stmt. ¶ 5.)

At the CSE meeting, E.L. was described by his mother as "severely autistic." He displayed difficulties and developmental delays in "communication, cognition, and socialization." (District Ex. 9, McCarton School Educational Progress Report of January 18, 2009 at 4.) He engaged in multiple ritualistic behaviors that interfered with his "learning, socialization and community integration." (Id. at 1.) Academically, at that time, E.L. functioned at between a 1st and 3rd grade level in most subjects and/or skills. (District Ex. 4, CSE Review Meeting Record of May 1, 2009 at 1–2.) McCarton reports indicate that E.L. had made significant progress in all areas, as he "respond[ed] well to the highly structured and individualized behavioral teaching methods that are used by the McCarton School." (District Ex. 9 at 4.) E.L. displayed significant expressive and receptive language delays; "his mean length of utterance is 3 to 7 words." (Id. at 3.) School reports noted that he had made progress engaging in conversation with adults and asking questions to obtain information. (Id.) Socially, E.L. did not initiate interactions with his peers unless he was prompted or the interaction was part of a structured activity. (Id.) He was able to complete most life skills independently (such as proper eating, hygiene, etc.) but required supervision and "multi-ple redirections due to his ritualistic behavior." (Id. at 4.)

At McCarton, E.L. received 40 hours of individualized education each week, placed in a classroom with five other peers. McCarton provided one-to-one student to teacher instruction (referred to as "1:1") under the ABA-based model of highly individualized instruction. (Id. at 1, 6.) Every day, E.L. received one hour of speech therapy and 45 minutes of occupational therapy. (Id. at 1.)

The CSE discussed E.L.'s then-current level of functioning and various strategies that could be employed to meet his needs. (Def. 56.1 Stmt. ¶ 6–8; Pl. Resp. ¶ 6–8.) The Mother expressed her opinion at the meeting that E.L. required 1:1 teaching and that she believed that continued placement at McCarton would best suit E.L. (District Ex. 4; Def. 56.1 Stmt. ¶ 9; Pl. Resp. ¶ 9.) E.L.'s behavioral needs were also discussed, primarily-relying on the Functional Behavioral Assessment ("FBA") completed by McCarton as well as the two observations of E.L. conducted by DOE staff members. (Def. 56.1 Stmt. ¶ 10; Pl. Resp. ¶ 10.) While the parties dispute when the Behavior Intervention Plan ("BIP") was created, the parties agree that the CSE discussed the various "interfering behaviors" exhibited by E.L. and strategies to deal with each behavior based on what had proven effective at McCarton and with E.L.'s home-based therapist. (Def. 56.1 Stmt. ¶ 13.)

After approximately four hours of discussion, the CSE recommended that E.L. be placed in a Special DOE class with a 6:1 student to teacher ratio, along with a dedicated Behavioral Management Paraprofessional assigned only to E.L. It was also recommended that E.L. receive two 45 minute sessions per week of 2:1 speech and language therapy and three 45 minute sessions per week of 1:1 speech and lan-

guage therapy, both with a speech therapist. Finally, the CSE recommended five 1:1 occupational therapy sessions of 45 minutes each per week. (Def. 56.1 Stmt. ¶ 14.) No counseling sessions were recommended for E.L. (as had previously been recommended at McCarton) because E.L.'s mother and McCarton staff felt such sessions were not necessary. (Def. 56.1 Stmt. ¶ 15.) The CSE recommended that E.L. receive year-round services because he required consistent support to avoid regression and ensure continued academic progress. (Def. 56.1 Stmt. ¶ 16.)

## 2. IEP and School Placement

The DOE's IEP for E.L., dated June 3, 2009, summarized his academic, behavioral and emotional skills and needs, as discussed in the CSE meeting. The IEP then set out 15 annual goals with 90 corresponding short-term objectives in the following areas: math, reading, writing, receptive and expressive language, social communication, prevocational skills, fine motor and grapho-motor skills, gross motor skills, sensory processing, personal safety, aerobic activities, verbal communication of feelings, social and play skills, and functioning within the classroom environment. (District Ex. 3 IEP for E.L.) The IEP also included a BIP detailing the behaviors exhibited by E.L. that interfered with his learning, primarily his lack of attention, verbal perseveration, out of context speech and multiple ritualistic behaviors. The BIP then set forth strategies for the paraprofessional, teachers and other school service providers to employ in dealing with these behaviors, including positive reinforcement, a point-system rewarding good behaviors and modeling of appropriate behaviors. (*Id.* at 26.) Kathy Kaufman, the school psychologist and District representative at the CSE, testified that the 6:1 plus paraprofessional placement was chosen for E.L. because it was similar to his class setting at McCarton. Such a

setting would encourage socialization with his peers and avoid the distraction of six students receiving instruction from six instructors simultaneously, while still providing him the 1:1 support of the paraprofessional. (Def. 56.1 Stmt. ¶ 19–20.)

On or around June 11, 2009, V.R. was informed by letter from the CSE that E.L.'s recommended placement for the 2009–10 school year was P169M at Robert F. Kennedy School. Gerri Klemm, teacher in the 6:1 classroom at P169M where E.L. would have been placed, described the educational setting at the school. Ms. Klemm has 30 years of experience working for the DOE and 10 years experience working with students with autism. Ms. Klemm has also received training in ABA and other autism teaching strategies. As of the summer of 2009, there were between three and five students in Klemm's class, along with herself and two paraprofessionals. The classroom space is designed to facilitate different instructional methods and activities including group meals, yoga, cooking, and free time. The students receive both group and individual instruction from herself and the paraprofessionals. Ms. Klemm uses a points reward system for behavior management, as recommended in E.L.'s IEP. (Def. 56.1 Stmt. ¶¶ 22–33.)

To facilitate the arrival of a new student, Ms. Klemm meets with the parents and the new student, allowing the new student to meet with his or her new classmates and adjust to the new environment. She also observes and assesses the new student frequently. During the transitional period and throughout the year, Ms. Klemm frequently communicates with parents through a homework book, phone calls, conferences, and parent training sessions. She further consults with the school's physical therapist and outside occupational therapists to incorporate such

treatments into her everyday instruction. (Def. 56.1 Stmt. ¶¶ 33–37.)

V.R., the mother, visited P169M on June 24, 2009 accompanied by Natali Wachtman Perilo, E.L.'s former special education teacher at McCarton. At the school, V.R. and Ms. Perilo met with Denise Velazquez, P169M's Parent Coordinator. Ms. Perilo drafted a written report documenting her observations of the school. She noted that the school used a weekly, rather than daily, behavioral incentive system. Further, students who exhibit problem behaviors were removed from the activity or taken to another room. The report further noted that the school did not have a qualified behavioral specialist on site, and that the teachers incorrectly "do ABA" only occasionally. Only some of the teachers had advanced degrees, and the paraprofessionals were only required to have a high school diploma. Ms. Perilo further reported that she witnessed children behaving erratically and acting without the supervision of teachers. Ms. Perilo concluded that it was "not recommended" that E.L. be placed at P169M. Perilo recommended that E.L. be placed in a school with a 1:1 student teacher ratio and a structured, intensive year-round program. (Plaintiff Ex. F, School Observation of P169M.)

On June 24, 2009, V.R. wrote a letter to the Department of Education's Committee on Special Education describing her visit to P169M and her belief that the school's services were inadequate for E.L.'s needs. She stated that "[m]ost importantly, at P169M E.L. would not receive enough of the 1:1 instruction that is critical for his success." The letter further stated that "subject to any appropriate program and placement that the Department of Education may offer, E.L. will be attending the McCarton School with an additional 8 hours per week of ABA therapy at home/in the community." She noted her intent to seek reimbursement for tuition and related expenses from the DOE. (Plaintiff Ex. E.)

On or around August 12, 2009, E.L.'s parents signed a tuition contract to re-enroll him in McCarton from September 2009 to June 2010. At McCarton during the 2009–10 school year, E.L. received both group and individual instruction; group time was added to his scheduled to encourage E.L.'s social development. E.L. was able to make academic progress at McCarton through small group instruction with the assistance of a "1:1 shadow" teacher. E.L. also received three hours per week of home-based ABA therapy to follow up on school instruction and work on daily living skills. (Def. 56.1 Stmt. ¶¶ 61–63; 64–75.)

### 3. IHO Hearing

On December 9, 2009, E.L.'s parents filed a due process complaint alleging that the DOE failed to provide E.L. with a FAPE for the 2009–10 school year and requested an impartial hearing to obtain reimbursement for the tuition paid to McCarton and for the home-based therapy E.L. received. (Def. 56.1 Stmt. 76.) Between January and April 2010, the IHO held nine hearing sessions on the matter. In total, the IHO considered the testimony of nine witnesses and numerous exhibits from both parties. On May 21, 2010, the IHO issued a written decision finding that the DOE did offer E.L. a FAPE for the 2009–10 school year, and therefore, the parents' claim for reimbursement was denied in its entirety. (Def. 56.1 Stmt. ¶ 79.)

The IHO decision first summarized E.L.'s academic and behavioral record, including standardized testing, progress reports from McCarton, and observations of E.L. by DOE personnel. The decision also reviewed the CSE process and IEP ultimately drafted for E.L., as well as the offerings of P169M.

Additionally, the IHO decision considered the testimony of numerous witnesses. Dr. Ivy Feldman, a clinical psychologist and board certified behavioral analyst who works as the educational director at the McCarton School testified that E.L. needed a structured, restrictive setting to make academic progress, and that he had improved since his re-enrollment at McCarton in September 2009. The IHO also considered the testimony of Bipa Bhandari, a licensed occupational therapist at McCarton, and Chigusa Haldeman, E.L.'s head teacher. Both described E.L.'s success with the ABA teaching method and his challenging behaviors including "throwing objects, hitting teachers, self injurious behavior and self-stimulatory behavior." (IHO Decision at 14.) Patrick Murano, E.L.'s home therapist, also testified regarding E.L.'s difficulty maintaining focus. He noted that home therapy helps reinforce E.L.'s school lessons, both academically and behaviorally.

The IHO also considered the testimony of V.R. regarding her son's educational needs. She testified about E.L.'s development since infancy and his improvement while enrolled at McCarton. V.R. stated that after rejecting the DOE placement, she visited P169M again in August 2009, this time with Dr. Carol Fiorili, a behavioral specialist. Dr. Fiorili and V.R. observed what would have been E.L.'s class, led by Ms. Klemm, for thirty minutes. In her testimony before the IHO, Dr. Fiorili noted that she did not observe any academic instruction during her time in the classroom, and she noted that the students were engaged in independent reading, which she did not believe would be an appropriate activity for E.L. She concluded that she would not recommend the program for E.L., relying on the posted schedule of activities, the limited amount of 1:1 instruction, and the lack of an on-site behavioral interventionist at P169M. Dr. Fiorili further testified that McCarton was

an appropriate placement for E.L. and that he also required home ABA services. (IHO Decision at 18–20.)

The IHO decision found that the IEP was "procedurally and substantively appropriate and that the parents had a meaningful opportunity to participate in the development of E.L.'s IEP." (*Id.* at 20.) The IEP included a "thorough discussion" of E.L.'s needs and addressed his behavioral and academic difficulties. The decision further disagreed with the parents' argument that the DOE's BIP and FBA were inadequate. The IHO found it reasonable that, where E.L. was not enrolled in a DOE program, the CSE relied on data from his then-school to determine his behavioral needs. Finally, the IHO found that E.L. could make educational progress in a 6:1 class with a full-time behavior management paraprofessional. The evidence presented demonstrated that E.L. could engage in certain activities independently and benefited from group interaction. The IHO further credited the testimony of Ms. Klemm that "she would have been able to provide E.L. with individualized instruction, as needed, to implement his IEP goals," given the small class size and assistance of three paraprofessionals. (*Id.* at 21–22.) On the basis of these findings, the IHO denied Plaintiffs' claim for reimbursement of tuition and home therapy.

### 4. SRO Decision

E.L.'s parents then appealed the decision of the IHO to the SRO. In arguing that the DOE failed to offer E.L. a FAPE for the 2009–10 school year, E.L.'s parents argued: "(1) that a district placement officer, rather than the IEP team at the CSE meeting, selected a school 'situs' for the student, and (2) that the district's recommended placement 'situs' could not provide OT [occupational therapy] to the student."

(SRO Decision at 6.) The parents further contended that the district "failed to adequately assess the student, failed to conduct an appropriate FBA, failed to develop a proper Behavioral Intervention Plan (BIP), and did not provide for a plan for transitioning the student into public schools." (*Id.*) The DOE responded that it had offered E.L. a FAPE because it offered the student a program that was reasonably calculated to provide educational benefits and the program could have been implemented at the recommended district placement, P169M. (*Id.* at 7.)

The SRO found that the IHO had correctly determined that "the district's recommended program and services were designed to confer the student with educational benefits during the 2009–10 school year." (*Id.* at 9.)

The SRO found that the CSE had adequately assessed E.L. The hearing record reflected that V.R. and representatives of McCarton participated fully and actively in the CSE meeting and that their input was very important to the CSE's determinations. Further, the CSE considered numerous evaluations of E.L. from various service providers, as well as two observations of him in a class setting. Further, V.R. did not object to the characterization of E.L.'s levels of functioning at the CSE meeting. For these reasons, the SRO found that the CSE did not have "insufficient data" in creating the IEP and that "the lack of formal testing … did not impede the student's right to a FAPE, significantly impede the parent's meaningful participation in the CSE process, or cause a deprivation of educational benefits." (*Id.* at 10.)

The SRO decision further upheld the IHO's determination that the DOE was reasonable in relying on information from E.L.'s service providers, including behavioral experts, in developing a BIP for E.L. The SRO agreed that the CSE was thorough in its discussion of E.L.'s behavioral needs and in recommending effective strategies for addressing these behavioral problems. Further, if E.L. had enrolled in the DOE program, the school staff members would have further developed this behavioral system after observing E.L. in the classroom setting. For these reasons, the SRO agreed with the determination of the IHO that the FBA and BIP were adequate.

The SRO next found that the DOE'S proposed "transition plan" was adequate and that the lack of "specified services on the IEP" to assist E.L. in transitioning to his new placement did not deny him a FAPE. The record demonstrated that the proposed placement "would have been responsive" in addressing E.L.'s needs during the transition. (*Id.* at 12.)

Additionally, the SRO rejected the parents' argument that the CSE's failure to identify a specific school while formulating the IEP violated Plaintiffs' rights. The SRO reviewed relevant statutes and case law in finding that that the lack of a specific school location in an IEP did not constitute a per se violation of the IDEA. The CSE and IEP set forth a recommended placement structure, and the parents had an opportunity to respond to that placement suggestion. Further, the District offered a specific school location in early June 2009, and the mother had an opportunity to visit the school before formally rejecting the IEP on June 24, 2009.

Finally, the SRO found that the IHO was correct in dismissing parents' claim that the District's recommended school placement was not sufficient because it could not offer E.L. occupational therapy. The SRO first agreed with the IHO that the claim was not raised in the due process complaint and therefore was procedurally barred. Further, the hearing record demonstrated that occupational therapy was

available at P169M as of July 2009, despite an earlier shortage that led the DOE to issue Related Services Authorizations (essentially vouchers) for occupational therapy. In sum, the SRO found that the recommended school would have been able to implement the IEP and offer E.L. all of his required services. (*Id.* at 16.)[2]

## STANDARD OF REVIEW

A district court reviewing the final determination of the SRO applies a "modified de novo review." *R.B. v. New York City Dept. of Educ.*, 713 F.Supp.2d 235, 244 (S.D.N.Y.2010) (quoting *Student X v. N.Y. City Dep't of Educ.*, 2008 WL 4890440, at *3 (E.D.N.Y. Oct. 30, 2008)). The role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed. *Gagliardo v. Arlington Central School Dist.*, 489 F.3d 105, 112 (2d Cir.2007). While a district court must conduct an independent review of the evidence and make a determination based on the preponderance of the evidence, this review should not invite the courts to "substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.* quoting *Board of Educ. v. Rowley*, 458 U.S. 176, 206–08, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).

To determine whether the Parents are entitled to a tuition reimburse-

ment, the Second Circuit engages in a three-step analysis. *A.C. ex rel. M.C. v. Board of Educ. of The Chappaqua Central School Dist.*, 553 F.3d 165, 171 (2d Cir. 2009). First, a court must examine whether the state has complied with the procedures set forth in the IDEA. Second, a court must determine "whether the IEP is substantively appropriate in that it is 'reasonably calculated to enable the child to receive educational benefits.' " *Id.* Finally, only if the IEP is procedurally or substantively deficient, the court then examines whether the private schooling obtained by the parents was appropriate to the needs of the child. This determination takes into account "equitable considerations," including the reasonableness of the parents' action, in determining whether a tuition reimbursement should be awarded. *Id.* The party commencing the administrative review, here Plaintiffs, bears the burden of persuading the court as to the inappropriateness of the IEP and the appropriateness of the private school placement.[3] *Gagliardo*, 489 F.3d at 111–12.

## LEGAL ANALYSIS

Plaintiffs now argue that the SRO's decision was clearly erroneous. In support of this claim, Plaintiffs contend: (1) P169M had failed to meet its students' IEP requirements for speech and language and occupational therapy and therefore was

**2.** The SRO decision also addressed the DOE'S cross appeal of the IHO's finding that "E.L. requires some one-to-one teaching." The SRO upheld this determination. As the DOE has not appealed that decision to this Court, we need not address it here.

**3.** In *Schaffer v. Weast*, 546 U.S. 49, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005), the Supreme Court held that the burden of proof in an administrative hearing under the IDEA rested with the party seeking relief (here the parents). The Supreme Court explicitly declined to address the question of whether states could override that rule by statute. *Id.* at 61,

126 S.Ct. 528. In 2007, New York passed legislation to alter this default rule. Under New York Education Law § 4404(1)(c), the school district bears the burden of proof in any impartial hearing, except that a parent seeking tuition reimbursement for a unilateral parental placement shall have the burden of proof on the appropriateness of that placement. In this case, the IHO and SRO placed the burden of proof on the NYC DOE in accordance with New York's statute. This Court need not address the question of who bears the burden of proof in this matter because the outcome would be the same.

not reasonably calculated to confer educational benefits on E.L., (2) the DOE's failure to perform a proper FBA constitutes a FAPE violation, (3) the parents were denied meaningful participation in the IEP meeting and school selection process, (4) the IEP failed to provide for a transition plan for E.L.

### 1. The record supports the SRO's finding that the proposed placement was appropriate given E.L.'s needs.

Plaintiffs first contend that "the program and placement at [P169M] cannot be considered 'reasonably calculated' to provide E.L. with a FAPE when the DOE knew or certainly should have known that at the time of the IEP meeting" that P169M was not meeting students' IEP mandates for related services. Specifically, they cite to DOE statistics showing that as of April 2008 more than 25 percent of students were not receiving their speech and language therapy mandates and more than 37 percent of students were not receiving their occupational therapy mandates. As of May 2009, Plaintiffs contend that these statistics had worsened, with 45 percent of students not receiving their occupational therapy mandates and 23.4 percent not receiving their speech and language mandates. By December 31, 2009, Plaintiffs contend that 68.4 percent of students at P169M were not receiving their required occupational therapy. (Pl. Br. at 6.) Plaintiffs further allege that the District "elected to conceal" this information from the impartial hearing in order to "hoodwink" the IHO. (Id.) Because E.L.'s IEP mandated that he receive five 45–minute sessions per week of speech therapy and five 45–minute sessions per week of occupational therapy, he was unlikely to receive such services, and therefore P169M could not have been reasonably calculated to afford him a FAPE. (Id. at 7.)

Defendant responds that Plaintiffs' argument is both procedurally barred and substantively meritless. First, Plaintiffs' argument regarding the availability of related services at P169M was unpreserved on appeal because it was not raised in the due process complaint. For this reason, although the IHO heard evidence on the matter, it held that the issue could not serve as the basis for finding that the District denied E.L. a FAPE. (IHO Decision at 22 n. 3.) The SRO agreed with this finding, explaining that there was no indication that the DOE had consented to the expansion of the issues before the IHO. (SRO Decision at 14.) Further, the SRO reasoned that this information was available to the parents prior to the IHO meeting, thus parents did not have an excuse for the failure to plead the issue in the due process complaint. (Id.)

Second, Defendants argue that this Court should uphold the finding of the SRO that even if the issue were properly raised, the hearing record did not support a finding that E.L. would have been deprived of occupational therapy had he attended P169M. The District had earlier explained to parents and schools that at times it might need to utilize outside contractors (through the voucher program) to meet IEP mandates. The District argues that it is "at best speculative that E.L. might not have received occupational therapy for some portion of the 2009–10 school year had he attended the DOE's recommended school." (Def. Br. at 17.) Further, such a failure would not have constituted a "material failure to implement his IEP" because the classroom teacher incorporated occupational therapy into the classroom. (Id.)

■ In *M.S. ex rel. M.S. v. New York City Dep't of Educ.*, 734 F.Supp.2d 271 (E.D.N.Y.2010), Judge Weinstein found under similar circumstances that the

DOE's failure to provide documents to the IHO demonstrating that not all students at a recommended placement were receiving their mandated occupational therapy did not constitute the denial of a FAPE. The court reasoned that the "bare fact" that not all students had in the past received all of their required services "[did] not mean that the school would have been incapable of providing the services to [the student] required by his IEP." *Id.* at 279. Further, even where a district fails to adhere strictly to an IEP, courts must consider whether the deviations constitute a "material failure" to implement the IEP and therefore deny the student a FAPE. *See A.P. v. Woodstock Board of Educ.,* 370 Fed.Appx. 202, 205 (2d Cir.2010) (finding that failure to provide student with aide as mandated in his IEP did not constitute a material failure to implement the IEP).

■ Here, assuming without finding that the issue is not procedurally barred, the Court agrees with the SRO that Plaintiffs' speculation that E.L. might not have received occupational therapy does not constitute the denial of a FAPE. There is no evidence that the DOE intended to "hoodwink" the parents or the IHO by concealing these statistics. Rather, the DOE recognized the shortage of service providers and offered parents vouchers to obtain such services outside of school. (SRO Decision at 15.) Further, the testimony presented at the IHO hearing demonstrates that occupational therapy was available at P169M by July 2009, when E.L. would have begun classes. Additionally, the testimony of Ms. Klemm, who would have taught E.L., demonstrated that E.L.'s class instruction would have incorporated occupational therapy techniques in daily instruction. For these reasons, the Court agrees with the SRO's finding that past failures to meet all occupational therapy mandates does not provide a basis for finding that E.L. was denied a FAPE

through placement at P169M. (SRO Decision at 15–16.)

**2. The Court agrees with the SRO that the FBA and BIP were sufficient.**

■ Plaintiffs next argue that the DOE failed to perform and complete a proper FBA because it relied only on past evaluations of E.L. They contend that because the CSE relied solely on evaluations from McCarton without any evaluations or observations of E.L., they did not properly assess his behavior as required by state and federal regulations. (Pl. Br. at 8.) Defendants cite to recent Second Circuit case law in arguing that the failure to conduct a FBA does not render the IEP legally inadequate so long as the student's behavioral needs were addressed. Here, the DOE relied on a variety of assessments and reports, including substantial input from E.L.'s then-current instructors, in formulating a behavioral plan that adequately addressed his needs and therefore afforded him a FAPE. (Def. Br. at 10.)

Under the IDEA, when a student's behavior impedes learning, the CSE must consider the use of behavioral interventions and supports to address the behaviors. 34 C.F.R. § 300.324(a). Additionally, New York state requires the development of an FBA for students whose behavior impedes learning. 8 N.Y.C.R.R. 200.4(b)(1)(v). In *A.C. ex rel. M.C.,* the Second Circuit held that the failure to conduct an FBA did not render the IEP at issue there legally inadequate where the behavioral issues were otherwise addressed, noting that such a decision is "precisely the type of issue upon which the IDEA requires deference to the expertise of administrative officers." 553 F.3d at 172 (internal quotation and citation omitted).

The preponderance of the evidence supports the SRO's conclusion that the CSE

had sufficient information about E.L.'s behaviors to craft an IEP that addressed those needs and afforded E.L. a FAPE. As described above, the CSE relied on evaluations from McCarton, observations of E.L. by DOE personnel, information provided by various service providers and E.L.'s mother regarding his behavioral needs. The CSE went through each behavior and used the information provided by McCarton to craft the IEP and BIP, incorporating those strategies that E.L. had best responded to in the past. (SRO Decision at 11.) The Court therefore finds that because the CSE fulfilled the purpose of the FBA, assessing "why the student engages in behaviors that impede learning and how the student's behavior relates to the environment," this requirement has been met, and E.L.'s IEP is legally adequate. *See Tarlowe v. New York City Bd. of Educ.*, 2008 WL 2736027 at *8 (S.D.N.Y. July 3, 2008).

**3. The Court agrees with the SRO's determination that E.L.'s parents were not denied meaningful participation in the school placement process.**

Parents contend that the DOE denied them "meaningful participation" in the IEP process because they did not have sufficient input in the placement decision to place E.L. at P169M. Parents contend that because the placement decision was not made at the CSE meeting, Defendants further violated the parents' rights.

Defendants counter that parents have a right to participate in the creation of a general educational program for their child, but do not have a right to participation in the decision regarding the "bricks and mortar" location of a placement. Parents were afforded the opportunity to participate in this process, and therefore, there is no basis for overturning the determination of the SRO.

█ Federal and state regulations specify that parents have the right to participate in meetings to determine the "identification, evaluation and educational *placement* of the child." 34 C.F.R. § 300.501(b)(1)(i) (emphasis added). However, the Second Circuit has interpreted the requirement that parents participate in the "educational placement" of the child to refer "only to the general type of educational program in which the child is placed." *Concerned Parents v. City Bd. of Educ.*, 629 F.2d 751, 756 (2d Cir.1980). Parents must be afforded the opportunity to participate in the formation of an educational program—the classes, individualized attention, and additional services—not the "brick and mortar" school location. *T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir.2009). While the parents also attempt to argue that the DOE did not afford them an ability to participate before the site selection decision was made, the Court agrees with the SRO that the record does not support this contention. The weight of the evidence demonstrates that the mother participated in the four-hour CSE meeting, had the opportunity to visit the recommended school site on two occasions, and had the opportunity to express her disagreement with the DOE's recommendation that E.L. receive 6:1 rather than 1:1 teaching. (SRO Decision at 13.)

Further, Plaintiffs' reliance on the *Jose P.* consent decree is misguided. In *Jose P. v. Ambach,* 669 F.2d 865 (2d Cir.1982), a class of plaintiffs sued the New York City Department of Education for failure to timely evaluate and place disabled children. However, Defendants are correct in pointing out that a consent decree can only be enforced by "a party, a party's privy, or an intended beneficiary." *E.Z.-L ex rel. R.L. v. New York City Dep't of Educ.,* 763 F.Supp.2d 584, 594 (S.D.N.Y.2011) (internal citations and quotations omitted).

Here, it is undisputed that E.L. received a timely placement, and therefore *Jose P.* is not relevant to the present case.

 Therefore, the Court agrees that the parents had the opportunity to meaningfully participate in the formation of an educational plan for E.L., and the CSE's failure to discuss a specific "bricks and mortar" school site did not deny parents their right of meaningful participation.

### 4. The DOE's transition plan for E.L. was adequate to afford him a FAPE.

Finally, Plaintiffs argue that the IEP did not specify a any "transition planning services" for E.L.'s return to public school. Given the child's need for consistency, Plaintiffs contend that the failure to specifically deal with serious changes to E.L.'s educational methods and school environment denied him a FAPE. The District counters that there is no requirement that a transition plan be specified in the IEP, and the record from the IHO hearing demonstrates that P169M was capable of accommodating E.L.'s needs during his transition to the school.

The Court agrees with Defendants that there is no requirement that an IEP specify a transition plan for a student attending a new school placement. *E.Z.-L ex rel R.L.*, 763 F.Supp.2d at 598. Further, district courts must show deference to administrative experts on "a difficult question of educational policy: how best to transition an autistic child [from a home to a school placement]." *T.P. ex rel. S.P. v. Mamaroneck Union Free School Dist.*, 554 F.3d 247, 253 (2d Cir.2009).

Here, while the IEP did not specifically address E.L.'s transition, the record demonstrates that P169M and Ms. Klemm had expertise and practice in transitioning students into a new placement. Klemm consults with the student and the parents to facilitate the change, allows the student time to adjust to the environment and new students, and communicates with parents about the child's needs during this time. The Court agrees with the determination of the SRO that "the proposed school would have been responsive in addressing any transition needs related to the student's enrollment." (SRO Decision at 12.) Therefore, this Court upholds the determination of the SRO that the failure to specify a transition plan did not deny E.L. a FAPE.

For these reasons, the Court finds that the SRO was correct in concluding that the DOE complied with the requirements of the IDEA. Therefore, we need not reach the issue of whether E.L.'s private school placement at McCarton was appropriate.

### CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment is GRANTED and Plaintiffs' motion for summary judgment is denied. The clerk of the court is directed to terminate ECF Docket Numbers 6 and 10 and close the case.

**SO ORDERED.**