[15 NE3d 792, 991 NYS2d 779]

RHONDA WILLIAMS, Individually and as Parent and Natural Guardian of A., an Infant, Respondent, v SHARON T. WEATHERSTONE, Defendant, and JORDAN-ELBRIDGE CENTRAL SCHOOL DISTRICT, Appellant.

Argued March 25, 2014; decided May 13, 2014

## POINTS OF COUNSEL

*Congdon, Flaherty, O'Callaghan, Reid, Donlon, Travis & Fishlinger,* Uniondale (*Christine Gasser* of counsel), and *Petrone & Petrone, P.C.,* for appellant. I. The Jordan-Elbridge Central School District owed no legal duty to the plaintiff student, who was injured while outside of its custody and control. (*Pratt v Robinson,* 39 NY2d 554; *Greenberg, Trager & Herbst, LLP v HSBC Bank USA,* 17 NY3d 565; *Turcotte v Fell,* 68 NY2d 432; *Akins v Glens Falls City School Dist.,* 53 NY2d 325; *Pulka v Edelman,* 40 NY2d 781, 41 NY2d 901; *Kimbar v Estis,* 1 NY2d 399; *Lauer v City of New York,* 95 NY2d 95; *Eiseman v State of New York,* 70 NY2d 175; *Sheila C. v Povich,* 11 AD3d 120; *Martinez v City of New York,* 90 AD3d 718.) II. The purported negligence of the Jordan-Elbridge Central School District was not a proximate cause of plaintiff's injuries. (*Akins v Glens Falls City School Dist.,* 53 NY2d 325; *Salvador v New York Botanical Garden,* 71 AD3d 422; *Gordon v Muchnick,* 180 AD2d 715; *Hanley v East Moriches Union Free School Dist. II,* 275 AD2d 389, 95 NY2d 769; *Pollock v Bones,* 52 AD3d 343; *Cominsky v City of Syracuse,* 21 Misc 3d 1135[A], 2008 NY Slip Op 52392[U]; *Squitire v Middle Country Cent. School Dist.,* 4 Misc 3d 1025[A], 2004 NY Slip Op 51044[U]; *Fotiadis v City of New York,* 49 AD3d 499; *Cruz v City of New York,* 6 AD3d 644; *Castillo v Amjack Leasing Corp.,* 84 AD3d 1298.) III. The Jordan-Elbridge Central School District's turn around procedure after a bus stop is missed does not violate mandatory rules or regulations, or guidelines adopted by the District. (*Diaz v New York Downtown Hosp.,* 99 NY2d 542; *Bax v Allstate Health*

*Care, Inc.*, 26 AD3d 861; *Davidson v Sachem Cent. School Dist.*, 300 AD2d 276; *Merson v Syosset Cent. School Dist.*, 286 AD2d 668; *Capotosto v Roman Catholic Diocese of Rockville Ctr.*, 2 AD3d 384; *Kosicki v Spring Garden Assn., Inc.*, 42 AD3d 909; *Carrasquillo v City of New York*, 78 AD3d 635; *Cave v Town of Galen*, 4 Misc 3d 1026[A], 2004 NY Slip Op 51073[U], 23 AD3d 1108; *Barretto v City of New York*, 229 AD2d 214, 90 NY2d 805; *David v County of Suffolk*, 1 NY3d 525.)

*Harris Beach PLLC*, Pittsford (*A. Vincent Buzard, David M. Capriotti* and *Lauren H. Seiter* of counsel), for respondent. I. Plaintiff's version of the facts must be accepted as true in considering this motion for summary judgment. (*Rizk v Cohen*, 73 NY2d 98; *Patrolmen's Benevolent Assn. of City of N.Y. v City of New York*, 27 NY2d 410; *Weller v Colleges of the Senecas*, 217 AD2d 280; *Hourigan v McGarry*, 106 AD2d 845.) II. The Jordan-Elbridge Central School District owed a duty to the plaintiff because her injury occurred during the act of busing and because the District placed her in a hazardous setting. (*Pratt v Robinson*, 39 NY2d 554; *McDonald v Central School Dist. No. 3 of Towns of Romulus, Varick & Fayette, Seneca County*, 179 Misc 333, 264 App Div 943, 289 NY 800; *Ernest v Red Cr. Cent. School Dist.*, 93 NY2d 664; *Norton v Canandaigua City School Dist.*, 208 AD2d 282; *Hanley v East Moriches Union Free School Dist. II*, 275 AD2d 389; *Bowers v City of New York*, 294 AD2d 526; *Harker v Rochester City School Dist.*, 241 AD2d 937; *Vernali v Harrison Cent. School Dist.*, 51 AD3d 782; *Womack v Duvernay*, 229 AD2d 488; *Keiser v Elmer*, 225 AD2d 589.) III. The Jordan-Elbridge Central School District is liable under the cases which impose liability on a person for causing another person to believe that entering the street is safe. (*Riley v Board of Educ. of Cent. School Dist. No. 1*, 15 AD2d 303; *Robbins v New York City Tr. Auth.*, 105 AD2d 616; *Barber v Merchant*, 180 AD2d 984.) IV. The Jordan-Elbridge Central School District owed a separate and independent special duty to the plaintiff as a result of the special relationship created by the education plan. (*Wenger v Goodell*, 220 AD2d 937; *Cuffy v City of New York*, 69 NY2d 255; *Reyes v City of New York*, 238 AD2d 563; *Metz v State of New York*, 20 NY3d 175; *McLean v City of New York*, 12 NY3d 194; *Florence v Goldberg*, 44 NY2d 189; *School Comm. of Burlington v Department of Ed. of Mass.*, 471 US 359.) V. Affirming the Fourth Department would not expand the liability of school districts, but if the Court determines that the Jordan-Elbridge Central School District did not owe a duty to the plaintiff under *Pratt v Robinson* (39 NY2d 554 [1976]), that decision should be

modified or limited. (*Ernest v Red Cr. Cent. School Dist.*, 93 NY2d 664.) VI. The Appellate Division properly determined that a question of fact exists as to whether the Jordan-Elbridge Central School District proximately caused plaintiff's injury. (*Mirand v City of New York*, 84 NY2d 44; *Doe v Fulton School Dist.*, 35 AD3d 1194; *Bell v Board of Educ. of City of N.Y.*, 90 NY2d 944; *Bello v New York City Tr. Auth.*, 50 AD3d 511; *Hanley v East Moriches Union Free School Dist. II*, 275 AD2d 389; *Pollock v Bones*, 52 AD3d 343; *Cominsky v City of Syracuse*, 21 Misc 3d 1135[A], 2008 NY Slip Op 52392[U]; *Squitire v Middle Country Cent. School Dist.*, 4 Misc 3d 1025[A], 2004 NY Slip Op 51044[U]; *Kush v City of Buffalo*, 59 NY2d 26; *Gordon v Eastern Ry. Supply*, 82 NY2d 555.)

### OPINION OF THE COURT

READ, J.

In *Pratt v Robinson* (39 NY2d 554, 561 [1976]), we held that a school district that "undertake[s] to transport students" assumes a common-law duty to "perform so much as it ha[s] undertaken in a careful and prudent manner." We are called upon to decide whether this duty had arisen here where a child was struck by a car before the approaching school bus stopped to pick her up. We conclude that defendant Jordan-Elbridge Central School District (the District) did not owe this or any other common-law duty to the child under the circumstances presented.

I

On the date of the accident, March 13, 2008, A. was a 12-year-old sixth-grade student at Jordan-Elbridge Middle School. Her mother, plaintiff Rhonda Williams (plaintiff), described A., who was born in 1995, as having exhibited "behavioral issues" while in kindergarten. Plaintiff at first chalked this up to A.'s young age (she was a four-year-old kindergartner) and grief over the then recent death of her father. But even after A. repeated kindergarten, she remained "very behavioral, noncompliant, [and] couldn't identify letters, numbers, that type of thing." A. was diagnosed by her doctors in the Albany area, where plaintiff then resided, with ADD/ADHD (attention deficit disorder/attention deficit hyperactivity disorder) and mild mental retardation. At the age of seven, A. began receiving Supplemental Security Income benefits on account of her mental disability.

Plaintiff moved from the Albany to the Syracuse area in March 2005. Desiring to mainstream her daughter's schooling as much as possible, she enrolled A. in the Jordan-Elbridge school system, subject to an individualized education plan (IEP).[1] A.'s IEP for the 2007-08 school year, which plaintiff assisted in formulating, specified under "Special Transportation Needs" that A. "should be transported to school even when she is within walking distance, due to concerns regarding her safety (big bus)." There was no provision for any escort or monitor to assist A. with busing.

Plaintiff's residence in March 2008 fronted Route 5, a busy state highway. A.'s designated bus stop was at the end of the roughly 20-yard driveway connecting her home to Route 5. A red dumpster was located on the grass to one side of the driveway, about 15 to 20 feet away from the mailbox, which is where the school bus stopped. Plaintiff testified that A. typically left the house at about 6:50 a.m., and played for 10 or 15 minutes near the dumpster while waiting for the bus to arrive; that she imposed "a very strict rule" that A. was never allowed past the dumpster at any time when playing in the yard; that she told A. to wait at the dumpster until the bus completely stopped at the mailbox; and that A. was never allowed to cross Route 5 unescorted. According to plaintiff, A. dependably followed and observed these "guidelines" and "boundaries."

On March 12, 2008, the District's transportation supervisor rerouted the bus that A. had been taking since the beginning of the school year so as to pick up several children from a family newly moved to the District. Since this bus no longer passed A.'s house, he assigned her to another bus whose existing route did. A.'s house became the first stop on this bus's route; her pick up and drop off times remained almost exactly the same. There was a monitor on this bus for students who, unlike A.,

---

1. As explained by the United States Court of Appeals for the Second Circuit, under the Individuals with Disabilities Education Act, or IDEA,

"states receiving federal funds are required to provide all children with disabilities a free appropriate public education. To meet these requirements, a school district's program must provide special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits. Such services must be administered according to an IEP, which school districts must implement annually" (*Gagliardo v Arlington Cent. School Dist.*, 489 F3d 105, 107 [2d Cir 2007] [internal quotation marks and citations omitted]).

were subject to IEPs that required the District to provide them with extra assistance during the commute to and from school. But the monitor knew A. as she had previously worked with her one-on-one as a teacher's aide. They became reacquainted when A. rode home after school on March 12th on her newly assigned bus.

On March 13th, A.'s newly assigned bus, with the monitor onboard, left the bus garage on time, at about 6:50 a.m., or before sunrise.[2] A.'s house was less than 10 minutes away, much closer than the previous first stop on this route, and the bus driver simply forgot to pick her up as he traveled west on Route 5. Neither the driver nor the monitor waved or otherwise signaled to A., whom the monitor glimpsed standing near the red dumpster as the bus passed by.

Alerted by the monitor to the missed stop, the bus driver proceeded 250 feet or so farther west to a vacant gas station on the corner where Route 31B meets Route 5 at an angle. He turned right into Route 31B and entered the gas station, turned the bus around to face Route 5, waited for eastbound traffic to clear (there was no westbound traffic at the time) and exited onto Route 5, traveling east behind a car operated by defendant Sharon T. Weatherstone (Weatherstone). The bus driver intended to go past A.'s house on the opposite (east) side of Route 5 a few hundred feet to a golf course, also on the highway's east side, where he could turn around again and pull back onto Route 5 traveling west. This would put him in position to pick up A. at her designated stop at the foot of the driveway to her house.

Shortly after the bus driver headed east on Route 5, though, both he and the monitor caught sight of what appeared to be debris being flung up into the air in front of the Weatherstone vehicle. Weatherstone steered her car off onto the shoulder of the highway, and as the bus driver slowed the bus down, the monitor spotted A. lying, obviously seriously injured, in the eastbound lane.

The State Police's "Collision Reconstruction Findings Report" (Collision Report) attributed the accident primarily to pedestrian error and secondarily to an obstructed view resulting from

---

2. Daylight Savings Time started on March 9th in 2008; sunrise in Syracuse, New York on March 13, 2008 was at 7:19 a.m. (*see* http://www.timeanddate.com/worldclock/astronomy.html?n=777&month=3&year=2008&obj=sun&afl=11&day=1).

Weatherstone's failure to adequately clear frost from her car's windshield.[3] When asked at the General Municipal Law § 50-h hearing if she had ever queried A. about "why she went out into the road" that morning, plaintiff replied that A. told her "that they forgot her and then they stopped and she looked both ways and she ran," which was the only explanation A. ever gave her. A. also testified about the accident at the 50-h hearing and gave a deposition. While her testimony was sketchy and variable, she fairly consistently said that she saw the bus go by and turn around, and that she looked both ways before crossing the road to catch the bus on the other side. A. further testified that plaintiff had told her to "be careful in the middle of the road . . . [b]ecause cars can hit you."

On October 27, 2008, plaintiff commenced this personal injury action individually and on behalf of A. against Weatherstone and the District. The District moved for summary judgment on October 21, 2011, seeking an order dismissing plaintiff's complaint and all cross claims against it. The District argued generally that it owed no duty to a student not within its physical care or custody and that, in any event, its purported negligence was not a proximate cause of A.'s injuries. The District and plaintiff submitted warring affidavits from experts in the field of school bus transportation. The experts differed about the propriety of the actions or inactions of District employees, and whether anything these employees (especially the bus driver) did or failed to do proximately caused the accident.[4]

On March 1, 2012, Supreme Court denied the District's motion in its entirety. Citing *Pratt*, the judge noted that while a school district "owes its students a duty to exercise the same degree of care toward them as a reasonably prudent parent . . . under similar conditions," this duty "exists only so long as a student is in [the district's] care and custody." In this case,

---

**3.** As observed soon after the accident by the bus driver, the monitor and the transportation supervisor, who arrived at the scene after having been radioed by the driver, only the windshield directly in front of the steering wheel had been scraped free of frost. The Collision Report indicated that the air temperature at the accident location measured approximately 12 degrees Fahrenheit at 9:19 a.m.

**4.** The experts focused on whether the bus driver created confusion and an unreasonably hazardous situation when he turned around within A.'s sight rather than circling to pick her up, or, alternatively, continuing on while notifying the bus dispatcher of the missed stop so that another bus might be sent to take her to school that day.

however, he held that A.'s status as a special needs child justified an "expansion" of the District's duty. The judge also denied that part of the District's motion seeking to dismiss the complaint for lack of proximate cause. He reasoned that the conflicting expert opinions created issues of fact and credibility for the jury. The District appealed.

On March 22, 2013, the Appellate Division, with two Justices dissenting in part, modified on the law and, as so modified, affirmed (104 AD3d 1265 [4th Dept 2013]). The majority, disagreeing with Supreme Court, rejected plaintiff's claim that the District owed A. a duty of care because she was a special education student with an IEP. The court observed that the IEP "required only that [the District] provide transportation to school [and] did not place [A.] within [the District's] orbit of authority while she waited for the school bus, [or] give rise to a duty . . . to ensure that the child was safe while waiting for the bus outside her home" (*id.* at 1266 [internal quotation marks and citation omitted]).

Nonetheless, the Appellate Division concluded that, "under the facts presented," A. was

> "within the orbit of [the District's] authority such that [it] owed a duty to [her] *based upon the actions of [the District]; i.e., the bus arrived at the bus stop, passed it, and the driver turned around to pick up the child.* Thus, 'the injury occurred during the act of busing itself, broadly construed' . . . Where, as here, it was reasonably foreseeable that the child would be placed 'into a foreseeably hazardous setting [the District] had a hand in creating,' [the District] owed a duty to the child" (*id.,* quoting *Pratt,* 39 NY2d at 561, and *Ernest v Red Cr. Cent. School Dist.,* 93 NY2d 664, 672 [1999], *rearg denied* 93 NY2d 1042 [1999], respectively [emphasis added]).

The court agreed with Supreme Court that an issue of fact existed about whether the District's alleged negligence proximately caused the accident. The Appellate Division agreed with the District, however, that Supreme Court should have granted it summary judgment on plaintiff's claim, as amplified by the

bill of particulars, of negligence based on purported violations of the Vehicle and Traffic Law.[5]

The dissenting Justices would have reversed Supreme Court's order and granted the District's motion in its entirety. Relying on *Pratt* and *Norton v Canandaigua City School Dist.* (208 AD2d 282 [4th Dept 1995], *lv denied* 85 NY2d 812 [1995], *rearg denied* 86 NY2d 839 [1995] [the school district had not yet assumed custody and control over a student injured when she crossed the street to wait for her school bus]), they observed the "well settled" rule that the District's duty flowed from physical custody and control; that at the time of the accident the District did not have physical custody of the child, who thus remained outside its orbit of authority; and that the District therefore "owed no duty to the child in this situation, and, absent duty, there can be no liability" (*id.* at 1267 [internal quotation marks omitted]).

The dissenting Justices rejected plaintiff's contention, endorsed by the majority, that the District "assumed a duty to the child as a consequence of the potentially hazardous situation allegedly created by the school bus driver in turning the bus around after missing the bus stop" (*id.* at 1268 [internal quotation marks omitted]). They distinguished *Ernest* on the ground that the District

> "did not release the child from its custody and control into a situation of immediate and foreseeable danger. In fact, the child was never in [the District's] custody or control on the day of the accident. Instead, the child was and remained in the custody and care of plaintiff, her mother, who was at home at the time of the accident. Plaintiff has cited no cases, and we could find none, where a school district was found to owe a duty of care to a child who was not in its custody at the time of the injury or who was not released from the school district's custody into a hazardous condition that caused the child's injury" (*id.* [citations omitted]).

On June 7, 2013, the Appellate Division granted the District leave to appeal to us, and certified the following question: "Was

---

**5.** The sections cited in the bill of particulars were Vehicle and Traffic Law §§ 509-b ("Qualifications of bus drivers"), 1101 ("Required obedience to traffic laws"), 1146 ("Drivers to exercise due care"), 1180 ("Basic rule and maximum [speed] limits") and 1174 (b) (governing the obligations of school bus drivers when receiving or discharging passengers).

the order of [the Appellate Division] entered March 22, 2013, properly made?" We answer the question in the negative for the reasons that follow.

## II

As the courts below and plaintiff recognize, *Pratt* is our seminal case on the duty owed by a school district to students whom it transports. Plaintiff also urges that, quite apart from *Pratt*, our decision in *Ernest* should compel us to conclude that the District owed a duty of care to A. We therefore consider both cases in some detail.

### Pratt

In *Pratt*, a seven-year-old child, having gotten off the bus at the regular bus stop closest to her family's residence, was struck by a truck and severely injured while crossing a heavily-trafficked street three blocks away from the stop while walking home. The school district had established the bus route; the actual transportation was supplied by a city-owned bus company. In ensuing litigation against the city, the school district and the bus company, plaintiffs (the child and her father) argued that the bus stop's location, while safe, was nonetheless negligently planned because it was located such that the child would have to cross the busy street while en route home.

Noting that "[n]egligence of the sort here alleged can only be found if there existed a duty on the part of the school district to transport [the child] to a location from which she could walk home without crossing any dangerous streets on the way," we explored potential sources of such a duty (39 NY2d at 559). We first decided that the legislature had not imposed any duty by statute. Then we observed that the "common-law custodial duty of a school toward its pupils" did not "supply any basis for liability" because that duty "stems from" and is "coextensive with and concomitant to [the school's] physical custody of and control over the child" (*id.* at 560). We added that "[w]hen that custody ceases because the child has passed out of the orbit of [the school's] authority in such a way that the parent is perfectly free to reassume control over the child's protection, the school's custodial duty also ceases" (*id.*).

Finally, we considered "one further and major source of liability"; namely, a school district that undertakes to transport students has a duty to perform this task "in a careful and prudent manner" (*id.* at 561). We noted that "[u]nder certain circumstances," school districts in New York and elsewhere

"have been held liable on this theory when children were injured, *even after they had technically been discharged from the bus* (see *McDonald v Central School Dist. No. 3*, 179 Misc 333, affd 264 App Div 943, affd 289 NY 800; *Van Gaasbeck v Webatuck Cent. School Dist. No. 1*, 21 NY2d 239; *Gleich v Volpe*, 32 NY2d 517; *Shannon v Central-Gaither Union School Dist.*, 133 Cal App 124; *Gazaway v Nicholson*, 61 Ga App 3, affd 190 Ga 345; Tort Liability of Public Schools and Institutions of Higher Learning for Accidents Associated With the Transportation of Students, Ann., 34 ALR3d 1210). Without exception, however, the liability in those cases stemmed either from the fact that the injury occurred during the act of busing itself, broadly construed, or from the violation of a specific statutory duty to see children safely across the street at which the bus is stopped, when their route took them across that street. No such issues have been raised in this case, nor would any apply to the facts here. New York's Vehicle and Traffic Law (§ 1174, subd [b]), for example, requires school bus drivers to stop, to remain stopped with their lights flashing, and to instruct children in the proper crossing of the street in front of the bus" (*id.* at 561 [emphasis added; other emphasis omitted]).[6]

Briefly reviewing the three New York cases cited, we mentioned that *McDonald* pinpointed the "genesis" of what became the duties imposed by section 1174 (b) to "the fact that, when children must cross the street where the bus stops, the bus itself acts as an obstacle to their clear view of oncoming traffic"; and commented that "[i]nterestingly, even such statutorily based liability addresses itself to *the students' transition from the area of transportation undertaken by the school district to the area which was outside its scope*" (*id.* [emphasis added]). In the same vein, we added that in *Van Gaasbeck* "we did not in any way suggest any sphere of liability beyond the statutorily mandated one *within the area of disembarkation*" (*id.* [emphasis

---

**6.** Section 1174 (b) has been amended since we decided *Pratt* to require, additionally, that the bus driver keep the school bus halted until the passengers are at least 15 feet from the bus and off the road or on a sidewalk, whether the passengers cross a public highway or discharge to the same side of the road (*see* L 1988, ch 529); and to clarify this provision's application to streets and roads in addition to public highways (*see* L 1990, ch 597).

added]). And finally, we noted that *Gleich* dealt with whether the school district should be held liable for placing a bus stop at a location allegedly unsafe for disembarkation. In each of these three cases, and in the two out-of-state cases cited, a child was injured shortly after alighting from a school bus.[7]

We further remarked that "[c]ases in other States in which liability has been imposed for accidents resulting from the negligence of third parties *after a child has left a bus stop area* have been rare"; that "[n]early all of them fit within the analysis we have presented in that they too involved either negligence toward a child . . . *still in the custody of the school or else failure to perform a specific duty imposed by statute*"; and that those

> *"few instances* in which other States have imposed liability for injuries *occurring at a point distant from the bus stop* involved the construction of a particular contractual obligation or else represented instances of straightforward judicial 'legislation' of a new duty on the part of school districts rather than the application of even liberal existing legal principles" (*id.* at 562 [citations omitted and emphases added]).

We perceived "no basis, either in statutes or common law, for the creation of a school's duty to protect its students from hazards which may beset them once they are on their way home and outside the control of the school" (*id.*). Thus, in *Pratt* we concluded that the school district fulfilled its duty to provide busing with due care; specifically, since "it did not undertake to, and in fact did not, provide transportation from the bus stop to the home of the plaintiffs, there was no activity for the performance of which it could be held negligent" (*id.* at 564).

---

7. In both *Shannon* (133 Cal App 124, 23 P2d 769 [1933]) and *Gazaway* (61 Ga App 3, 5 SE2d 391 [1939]), the children were struck and seriously injured by an automobile as they crossed to the opposite side of the road after getting off the bus. In *Shannon*, the bus driver was allegedly negligent for stopping where he did, parking at the roadside in a manner that violated state law and permitting the child to leave the bus without warning him of the danger of a rapidly approaching car. The *Gazaway* court concluded that the bus driver had a "duty . . . to discharge a passenger at a place of safety, and where a carrier deposits him at a place which it knows will reasonably expose him to unusual and unnecessary peril it may be held liable for a proximately resulting injury" (61 Ga App at 10, 5 SE2d at 396).

*Ernest*

In *Ernest*, a second-grade student was hit by a truck and severely injured while crossing the road on which his school was situated. There were no sidewalks on this road, and, additionally, there were no traffic signals or crosswalks to assist students who needed to cross the road to get to the nearest sidewalk, north of the school. Because of these conditions, the school, as a safety precaution, did not allow students to leave the school grounds on foot at the end of the day until all the school buses had departed. On the day of the accident, though, the school violated this long-standing policy. The driver of the truck did not see the student because his view was obstructed by a departing bus. The accident took place about 167 feet north of the school's northern boundary line.

We concluded that *Pratt* did not preclude liability because there, the plaintiff schoolchild was " 'set down in a safe spot, and nothing untoward . . . occurred in the course of . . . disembarkation' " (*Ernest*, 93 NY2d at 672 [emphasis omitted], quoting *Pratt*, 39 NY2d at 560). By contrast, the injured plaintiff in *Ernest*

> "was not released to a safe spot but to a foreseeably hazardous setting partly of the School District's making. Thus, while a school has no duty to prevent injury to schoolchildren *released in a safe and anticipated manner*, the school breaches a duty when it *releases a child without further supervision* into a foreseeably hazardous setting it had a hand in creating" (93 NY2d at 672 [emphases added]).

We reversed Supreme Court's grant of summary judgment to the school district, affirmed by the Appellate Division, concluding that "a jury could find that [the district] breached this legal duty by releasing [the child] to walk home before the school buses were out of the vicinity" (*id.*).

In support of our holding, we discussed *McDonald* in more detail than we had in *Pratt*. In *McDonald*, a child, after having exited a school bus, was hit by a car whose driver failed to stop as required by law. The school district had adopted a rule, communicated to students, that whenever a school bus stopped on the opposite side from a child's home, the child should walk directly in front of the bus when crossing the street. In rejecting the school district's motion for a new trial, we concluded that the jury might well have found that the district, by making this

rule, assumed a duty to protect the child against the danger of approaching traffic and should have gone further by requiring the driver to signal when it was safe to cross the street. In *Ernest*, we summed up *McDonald* as "stand[ing] for the proposition that a school district's duty of care requires *continued exercise of control and supervision* in the event that release of the child poses a foreseeable risk of harm" (93 NY2d at 672 [emphasis added]).

## III

Plaintiff proposes four theories to support the existence of a duty owed A. by the District: first, that A.'s injuries "occurred during the act of busing itself, broadly construed" (*Pratt*, 39 NY2d at 561); second, citing *Ernest*, that the District "placed" A. in a hazardous situation which it created; third, that the District is liable under *Riley v Board of Educ. of Cent. School Dist. No. 1* (15 AD2d 303 [3d Dept 1962]) and similar Appellate Division cases that impose a duty of care on someone who signals another that crossing the street is safe; and fourth, that by providing A. "special busing services" because of her mental limitations, the District owed her a separate and independent special duty. Finally, in the alternative, plaintiff argues that we should limit or modify *Pratt* and *Ernest* and hold what she claims these cases already imply: that a school district owes a duty to a child if it creates a foreseeably hazardous situation prior to the time the bus stops for boarding. We address each of these theories in turn.

### The Act of Busing, Broadly Construed

Plaintiff reasons that A.'s

> "injury clearly occurred during the act of busing[,] broadly construed[,] because the bus arrived at the bus stop, passed the plaintiff and turned around to pick her up. The bus was present at the scene and was attempting to pick up the child. The child saw the bus, was confused by its operation and was attempting to catch the bus, all of which relates to the act of busing[,] broadly construed."

This argument divorces the meaning of the phrase "the act of busing itself, broadly construed" from its very particular context. We used this expression in *Pratt* solely with reference to cases where we, and other courts, have extended a school's duty to transport students in a careful and prudent manner to

cover a child injured just after alighting from a school bus. All the cases that we discussed or cited in *Pratt* shared this fact pattern. We concluded that a school owed a duty of care to a child within this often statutorily-based "area of disembarkation" or "transition" even though, having stepped off the bus, the child was no longer within the school's physical custody (*id.* at 561). We reinforced the limited spatial and temporal nature of this duty by referring disparagingly to those "few instances" where other states "imposed liability for injuries occurring *at a point distant from the bus stop*" as "judicial 'legislation' " unless based on a contractual obligation (*id.* at 562 [emphasis added]).

■ The principles established in *Pratt* may be read to suggest that a school is equally liable for injuries to a child within the area of embarkation or transition created when a school bus stops to pick up passengers and engages its red flashing lights and stop sign to halt motorists.[8] We need not address this issue, though, because A. walked onto the highway and was injured while the bus was still moving in traffic. She was therefore never within the District's physical custody, or any time- and space-limited area of implied custody and control that may arise once a bus stops and passengers begin to board. Thus, her injuries did not "occur[ ] during the act of busing itself, broadly construed" (*id.* at 561).

### Creating a Hazardous Setting

Citing *Ernest*, plaintiff argues that the District is liable for A.'s injuries because it "placed" her in a foreseeably hazardous setting of its own making. Plaintiff points to various purportedly negligent actions or inactions on the part of District employees (e.g., the transportation supervisor tried but failed to reach her by telephone on March 12th to let her know that a

---

**8.** The dissent asserts that we "offer[ ] no rationale" for this possible limitation (dissenting op at 406). But if the school remains responsible for the safety of a child who has disembarked a school bus only during the time and area of the child's transition from the school's actual custody to the parent's actual or potential custody, as we have held, then, logically, the parent is responsible for the child's safety until the child gets on the bus or, arguably, at least reaches this transition area when attempting to board. By contrast, the way in which the dissent interprets the phrase "the act of busing itself, broadly construed" is entirely open-ended. While I suspect that the dissenters would agree that a school district does not have a duty to warn or protect a child against all hazards that might arise during "the act of busing itself, broadly construed," they offer no limiting principle.

different bus would be picking A. up the next day). She again highlights, though, that the bus driver missed A.'s designated bus stop and then turned around down the road and traveled back toward the stop thereby, the argument goes, placing A. in a setting that was foreseeably hazardous because these actions "confused" her into attempting to cross Route 5 on her own.

■ Even if the bus driver was negligent, as plaintiff alleges, negligence does not create duty, and plaintiff's reliance on *Ernest* to establish otherwise is misplaced. Critically, in *Ernest* the child was in the school's physical custody when he was released "without further supervision" into an arguably hazardous setting. In other words, the school was in a position to determine the timing, place and conditions for sending the child home, and the school was under a duty to release the child from its physical custody "in a safe and anticipated manner" (*Ernest*, 93 NY2d at 672). We emphasized this point further in our discussion of *McDonald* (*id.* [stating that *"McDonald* stands for the proposition that a school district's duty of care requires *continued exercise of control and supervision* in the event that *release* of the child poses a foreseeable risk of harm" (emphases added)]). As we recently put it in *Stephenson v City of New York* (19 NY3d 1031, 1034 [2012]), *Ernest* marks an exception to the general rule that a school's duty of care does not extend beyond school premises, and is limited to "injury that occurred . . . shortly [after school hours] *upon the student's departure from the school"* (emphasis added).

Here, by contrast, A. was not injured while going home from school; indeed, she was never in the District's physical custody on March 13th, so the District was never in a position to "place" or release her into a hazardous setting at any time. Instead, she was in plaintiff's custody while she waited near the dumpster for the school bus. By setting specific "guidelines," "boundaries" and rules designed to keep A. away from busy Route 5 when she was outside by herself, plaintiff implicitly acknowledged her responsibility for A.'s safety during those times.

## Signaling

Plaintiff also seeks to impose a duty on the District on the basis of Appellate Division case law broadly holding that a motorist who signals a pedestrian to cross a street risks liability if the pedestrian is hit by another vehicle (*see e.g. Riley*, 15 AD2d at 305 [the defendant undertook an "affirmative act of waving her hand to direct the discharged passenger"]; *Robbins*

*v New York City Tr. Auth.*, 105 AD2d 616 [1st Dept 1984] [bus driver waved passenger to cross the street in front of the bus]; *Yau v New York City Tr. Auth.*, 10 AD3d 654 [2d Dept 2004] [same]). All of these cases entail some intentional hand motion or gesture directed by the motorist at the pedestrian. Having thereby assumed a duty to guide the pedestrian to safety, the motorist must exercise reasonable care in doing so.

■ Here, though, neither the bus driver nor the monitor waved at or signaled A. as the bus missed her designated bus stop, traveling west; after turning around to travel east, they did not even see her before the accident. In short, they made no gestures at all, much less any gesture that a jury might conclude intentionally summoned A. to cross the highway. Consequently, plaintiff proposes that the "act of turning around the bus and coming toward [A.] was the functional equivalent of the hand signal given in *Riley*"; and "[t]he fact that the signal was by the bus, rather than by a hand, was no less communicative . . . , given [A.'s] age and mental capacity." We find no basis in the case law for this novel theory. In any event, whatever A. may have thought when she saw the bus turn around, there is no reason to suppose from this record that the bus driver intended by driving east to signal A. to leave the safety of her designated bus stop and cross Route 5.

## Special Duty

An agency of government may be liable for the negligent performance of a governmental function when there exists a special duty to the injured person, in contrast to a general duty owed to the public (*see McLean v City of New York*, 12 NY3d 194 [2009]). Plaintiff claims that A. is owed such a special duty by the District as a result of a special relationship created by the IEP; specifically, the "special busing services" afforded A. in the IEP.

■ But the IEP only directed the District to transport A. to and from school even though she lived within walking distance. In short, the District undertook in the IEP to provide the same busing for A. required of it for all children in "grades kindergarten through eight who live more than two miles from the school which they legally attend" (Education Law § 3635 [1] [a]), although A. was furnished portal-to-portal busing (*see id.*, § 3635 [1] [d]). Notably, the IEP did not call for an aide or escort to wait with A. at her designated bus stop (*see* US Department of Education, Q and A: Questions and Answers on Transportation [Nov. 2009], http://idea.ed.gov/explore/view/p/,root,dynamic,Qu-

Corner,12, [noting that "(f)or students who may need assistance with 'going' to the bus stop or 'waiting' at the bus stop independently, adding a bus stop monitor can be considered" by the child's IDEA Team]). Plaintiff suggests that busing a special needs child requires extra care, and therefore imposes additional transportation-related obligations on the District. But this argument is belied by the IEP itself, which did not specify any "special busing services" and required only regular bus transportation.

### Limiting or Modifying *Pratt* and *Ernest*

■ Finally, plaintiff asks us to limit or modify *Pratt* and *Ernest* if we disagree with her position (as we do) that these cases provide a basis to impose liability on the District for A.'s injuries without any "additional exception or extension." Basically, she urges that because of the "extreme circumstances" here, custody should not be the litmus test for duty. We have, however, repeatedly endorsed the efficacy and fairness of defining a school's common-law duty to supervise or transport students in terms of physical custody.

The concept of in loco parentis is the fountainhead of the duty of care owed by a school to its students (*see Mirand v City of New York*, 84 NY2d 44, 49 [1994] ["(t)he duty owed derives from the simple fact that a school, in assuming physical custody and control over its students, effectively takes the place of parents and guardians"]). In *Pratt* and *Ernest* we identified limited situations where a school might be liable in the absence of physical custody of an injured child. But in the circumstances described, the school still exercised control over the time, place and conditions of a child's release from its physical custody to the protection of a parent or guardian. Here, A. never left plaintiff's custody and control on the morning of March 13th, and plaintiff trusted A. to wait at her designated bus stop independently. Because the accident did not happen while A. was within the District's custody and control, the District is not liable for A.'s injuries.

Accordingly, the order, insofar as appealed from, should be reversed, with costs; defendant School District's motion for summary judgment dismissing the complaint and cross claims against it granted; and the certified question answered in the negative.

SMITH, J. (dissenting).I would hold that on these facts the school district owed plaintiff's daughter a duty of reasonable

care, and that there is a triable issue as to whether her injury was proximately caused by a breach of that duty.

## I

A school's duty to its students arises because the school "in assuming physical custody and control over its students, effectively takes the place of parents and guardians" (*Mirand v City of New York*, 84 NY2d 44, 49 [1994]). In *Pratt v Robinson* (39 NY2d 554, 560 [1976]), we explained that when the school district's custody of a child "ceases because the child has passed out of the orbit of its authority in such a way that the parent is perfectly free to reassume control over the child's protection, the school's custodial duty also ceases." Cases in which school buses are picking up or discharging children are at the borderline between the school's custody and the parents' control, and it can be difficult in such cases to decide when the school district's duty of care begins or ends.

I find two school-bus cases especially relevant here, *Pratt* and one of the decisions it relies on, *McDonald v Central School Dist. No. 3 of Towns of Romulus, Varick & Fayette, Seneca County* (179 Misc 333 [Sup Ct, Seneca County 1941], *affd* 264 App Div 943 [4th Dept 1942], *affd* 289 NY 800 [1943]). In *McDonald*, a child was injured while crossing the street immediately after getting off her school bus. The bus driver, in compliance with a school district rule, had waited at the stop after letting the children off, allowing them to cross in front of the bus. The driver saw, but failed to warn the child about, the car that hit her. A jury returned a verdict against the school district, and the trial judge, Justice Van Voorhis (later a Judge of this Court), denied a motion for a new trial. He said that "[t]he presence of the bus necessarily created some hazard," because it obstructed the view of children and drivers, and he found evidence to support a finding that the school district "assumed a duty to protect [the child] against the special danger which it had created by its own rule" (*id.* at 336). The Appellate Division and this Court affirmed without opinion.

In *Pratt*, a child was dropped off by a school bus, walked three blocks toward her home, and then was hit by a truck while crossing a street. The school district was sued on the theory that it was negligent for failing to locate its bus stop at a place nearer to the child's home. We held that the school district owed the child no duty, because the child had left the school

district's custody, and her parents could have resumed control. We distinguished *McDonald* as a case in which "the injury occurred during the act of busing itself, broadly construed," and referred to Justice Van Voorhis's observation that "when children must cross the street where the bus stops, the bus itself acts as an obstacle to their clear view of oncoming traffic" (*id.* at 561). We expressed a similar view of *McDonald* in *Ernest v Red Cr. Cent. School Dist.* (93 NY2d 664, 671 [1999]), where we summarized it as holding that

> "although a school district's duty of care toward a student generally ends when it relinquishes custody of the student, the duty continues when the student is released into a potentially hazardous situation, particularly when the hazard is partly of the school district's own making."

This case involves a child being picked up, not dropped off, by a school bus, but that distinction seems to me of little significance. I would hold that the case is within the rule established by *McDonald* and restated in *Pratt* and *Ernest*: A school district's duty to use due care exists where an injury occurs during "the act of busing itself, broadly construed" and where the child is exposed to a hazard "partly of the school district's own making." Here, the school district's bus had gone to the child's house to pick her up, had mistakenly driven past and was returning to complete the pick up. This was the act of busing, broadly construed. And the hazard here was, accepting the facts as plaintiff claims them to be, of the school district's own making. Plaintiff's daughter went into the street in direct response to the bus driver's allegedly negligent maneuver. Imagine a case like this one, except with stronger proof of the bus driver's fault: suppose for example, that the driver had negligently stopped the bus across the street from the child's house, causing her to think she had to cross. In such a case, the school district surely should be liable for the resulting injury—and, on the duty issue, the hypothetical case is indistinguishable from this one.

The majority acknowledges that the logic of the school-bus drop-off cases might be extended to a pick-up case, but would find a duty, if at all, only where the child is "within the area of embarkation or transition" and only after the bus "stops to pick up passengers and engages its red flashing lights and stop sign to halt motorists" (majority op at 400). This limitation, for

which the majority offers no rationale, seems wholly arbitrary to me. What logic justifies excluding a case like this one, where, because of the driver's negligence, the bus failed "to stop to pick up a passenger" and then, according to plaintiff's claim, made an ill-judged turn that lured the child out of "the area of embarkation and transition"? I think our precedents, fairly read, compel the conclusion that a duty existed here.

## II

For me, the issue of whether the child's injuries were proximately caused by a breach of the school district's duty of care is more troublesome than the issue of whether there was such a duty. I do not find this a strong case against the school district. Indeed, I wonder whether plaintiff might have had more success on the duty issue if she had a stronger case on negligence and proximate cause. But I conclude that plaintiff has presented enough evidence on those issues to get to a jury.

Plaintiff's theory is, in essence, that the school district should have told its driver that plaintiff's daughter was a special needs child; that the driver, after he missed his stop, should either have taken her special needs into account or called in for instructions on what to do; and that the driver or his supervisor, knowing that the child's mental disability could impair her judgment, should have foreseen that the returning bus would lead her to put herself in danger. This theory, while debatable, is not plainly wrong. It was endorsed by plaintiff's expert witness, a specialist in the transportation of students and of passengers with special needs, and it found further support in the testimony of the school district's transportation supervisor. The supervisor testified that, had he known that the child "had some issues with her capabilities to understand what to do and not to do," and had he been asked by the bus driver whether to turn the bus around, he would not have advised him to do so, because the turn could create confusion and danger. He would, he testified, have told the driver to go on his way and sent another bus; there was evidence that another bus was in the area. A jury could find that what the supervisor said he would have done is what due care required, and that the failure to exercise due care proximately caused the child's injuries. I would therefore affirm the order of the Appellate Division.

Judges GRAFFEO, RIVERA and ABDUS-SALAAM concur with Judge READ; Judge SMITH dissents in an opinion in which Chief Judge LIPPMAN and Judge PIGOTT concur.

Order, insofar as appealed from, reversed, with costs, defendant Jordan-Elbridge Central School District's motion for summary judgment dismissing the complaint and cross claims against it granted, and certified question answered in the negative.